**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**Eastern Division**

| | | |
|---|---|---|
| SHAMIM RABBANI,<br>individually and on behalf of<br>all others similarly situated | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | Civil Action No. |
| | ) | |
| vs. | ) ) | |
| | ) | |
| DRYSHIPS INC, | ) ) | JURY TRIAL DEMANDED |
| | ) | |
| GEORGE ECONOMOU,<br>PANKAJ KHANNA<br>ZIAD NAKHLEH<br>BOARD OF DIRECTORS OF DRYSHIPS,<br>AND OTHER OFFICERS (individually)<br>NIKI FOTIOU<br>GEORGE DEMATHAS<br>GEORGE XIRIDAKIS<br>EVANGELOS MYTILINAIOS<br>HARRY G. KERAMES<br>VASSILIS KARAMITSANIS<br>CHRYSSOULA KANDYLIDIS<br>DEUTSCHE BANK AG<br>MERRILL LYNCH & CO., INC | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION COMPLAINT |
| | ) | |
| Defendants. | ) ) ) ) | |

## CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

COME NOW, Shamim Rabbani (hereinafter "Plaintiff"), and allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through their attorney, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by the Defendants, United States Securities and

Exchange Commission ("SEC") filings, wire and press releases published by and regarding the company, securities analyst's reports and advisories about the company, and information readily obtainable on the internet.

This is a class action against DryShip and its officers and directors for violation of the federal securities laws. Plantiff bring this action on behalf of themselves and all other persons or entities, except for defendants and certain of their related parties as described below, who purchased DryShip securities (the "Class") during the period between December 2008 through December 2010, inclusive (the "Class Period").

I.  **INTRODUCTION**

1.      In a February 28, 2005 article entitled *"The Golden Fleece?"* George Economou ("Economou"), Chairman of DryShips Board and Company's Chief Executive Officer ("CEO"), was quoted as saying that *"Americans are the dumbest investors around [...]"*

2.      This action involves a series of materially false and misleading statements and omissions by Defendants in connection with (i) DryShips' spin-off of 100% wholly owned subsidiary of DryShips', Primelead Shareholders Inc. ("Primelead"); (ii) DryShips' financial health, and (iii) its ability to comply with loan covenants. Furthermore, Lead Plantiff and members of the Class suffered serious harm as a result of number of violations of law committed by DryShips' officers and directors, and by violations of law committed by officers and directors of Merrill Lynch & Co. ("Merrill") and Deutsche Bank AG ("Deutsche Bank"), who acted as underwriters for secondary stock offerings ("Underwriter Defendants"). Thus, this action also involves allegations of breach of fiduciary duties by DryShips' officers and directors, as well as Underwriter Defendants.

3.      Economou and the Dryships Board entered into an October 6, 2008, agreement to purchase nine vessels from Economou's private fleet, with reckless disregard for the interests of DryShips and its shareholders, and with a primary goal of allowing Defendants, Economou and his sister, Chryssoula Kandylidis ("Kandylidis"), to secure 3.5 million shares of DryShips at prices between $20 and $30 per share. Then, in December of 2008 DryShips announced that it has agreed to cancel the contract, paying large penalties to Cardiff.

4.      On October 8, 2008, in a press release, DryShips announced that in addition to purchasing nine Capesize drybulk carriers, it was also entering the offshore drilling segment. Economou boasted that DryShips was entering an industry that has "solid prospects for the next three to five years."

5.      This venture was marked by procurement of two ultra deep water (UDW) vessels. Primelead has entered into an agreement to take over equity interests of a holding company which owns two advanced capability UDW drillships, which at the time were controlled by clients of Cardiff Marine Inc., Group of Companies ("Cardiff"), including Economou. In the 2010 Annual Report on Form 20-F, DryShips reported that Economou owns 70% of the issued and outstanding capital stock of Cardiff.  Furthermore, the annual report stated that Economou's sister Kandylidis owns the remaining 30% of the stock. In consideration for the drillships, the sellers, including Economou, received 25% of all the then issued and outstanding shares of Primelead. Primelead assumed $252.3 million of existing debt and approximately $1.0 billion in remaining shipyard installments relating to these drillships. Primelead was later renamed Ocean Rig UDW[1].

---

[1] Primelead and Ocean Rig UDW may be used interchangeably in this Complaint to indentify the spin-off entity.

6.     While amassing an enormous amount of debt with the purchase of these drillships from Cardiff, in an In an article by Nigel Lowly of Lloyds List, entitled "*Economou Allays Fears as DryShips Shares Fall,*" published on November 7, 2008, Economou falsely assured the investors that DryShips will not breach its loan covenants. In January 2009, on a date presently unknown, DryShips breached its loan covenants.

7.     In the press release dated October 6, 2008, Economou falsely stated that DryShips intends to spin off Primelead to its shareholders in the form of a share dividend. Further, he misleadingly promised that DryShips intended to file the necessary documents with the Securities and Exchange Commission (SEC) within "the next few weeks and to complete the spin off either during the 4th quarter of 2008 or the 1st quarter of 2009 subject to SEC review." However in order to complete the spin-off process, DryShips needed to secure charters and financing to cover the $1.0 billion in shipyard payments. Due to lack of financing and charters, it was not feasible for DryShips to complete the spin-off. Notwithstanding these material facts, all throughout the 4th quarter of 2008, and 2009 and 2010, Economou and then Pankaj Khanna ("Khanna"), who became DryShips Chief Operating Officer (COO) in March 2009, continued to feed DryShips shareholders with empty promises of spin-off and free shares of Ocean Rig UDW. Khanna has indicated during October 27, 2009, Third Quarter Earnings Conference Call, DryShips was in fact considering the IPO option.

8.     Furthermore, on May 7, 2009 DryShips filed a prospectus supplement with SEC which incorporated by reference DryShips annual report on Form 2-F/A filed on April 3, 2009. This annual report stated that DryShips shareholders will receive a share of Primelead (spin-off entity) for each share of DryShips common stock. Then, on November 19, 2009, DryShips filed another prospectus supplement with SEC, which incorporated by reference its base prospectus. This

prospectus stated once again that DryShips will "*spin-off Primelead to [its] shareholders by means of distribution to [its] shareholders of one share of Primelead for each of [its] outstanding shares [...]*" (emphasis added).

9.      On April 21, 2010 DryShips filed another prospectus supplement with SEC which once again misleadingly promised a share per share distribution of Primelead / Ocean Rig UDW shares.

10.     In addition, Khanna has continued to promote DryShips stock as a great buy in the press, a two-for-one deal. On October 29, 2009 during a DryShips Third Quarter Earnings Conference Call, Khanna stated that by purchasing DryShips stock, investors were also "buying a free option on [his] drillships." Based on Khanna's false representations regarding the IPO, DryShips shareholders paid an inflated market price for Dryships common stock.

11.     While DrysShips shareholders were promised a share of Ocean Rig UDW per share of Dryships common stock, ultimately, in October of 2011, DryShips announced that it "*will distribute 2,967,359 common share of Ocean Rig UDW [spin-off entity] on a pro rata basis, or 0.007266 common share of Ocean Rig UDW for every one share of common stock of DryShips.*" Furthermore, DryShips stated that its shareholders will not be able to keep the share of the spin-off, as the shares would be sold on the open market, and the proceeds would then be distributed to shareholders.

12.     Ultimately, as the true facts about DryShips' financial health, contract cancellation and its ability to comply with loan covenants, as well as the spin-off became known, DryShips stock fell a staggering 79% from January 9, 2009 to February 2, 2009. DryShips stock price fluctuated between $3.00 and $6.00 for the remainder of 2009 and 2010 calendar years as the investors were still lured by shares of Ocean Rig UDW.  On the first day of trading, the market price of

Ocean Rig UDW common stock reached $18.73 per share. On December 15, 2011 DryShips common stock was trading at $2.10 per share.

13.     It was entirely foreseeable to DryShips, Economou, Khanna and the DryShips Board that concealing from investors (i) DryShips deteriorating financial condition, (ii) DryShips intent to raise equity, (iii) the circumstances surrounding the spin-off and/or IPO, including DryShips' ability to secure charters and financing, would artificially inflate the price of DryShips common stock. It was similarly foreseeable that the ultimate disclosure of this information and, in particular, the truth about DryShips' ability to comply with its loan covenants and drillships IPO, would cause the price of DryShips' securities to drop significantly as the inflation caused by their earlier misstatements was removed from stock.

14.     Based on the facts alleged herein, Lead Plantiff assert claims under (i) Section 10(b) of the Exchange Act against Defendants DryShips, Economou and Khanna; (ii) Section 20(a) of the Exchange Act against Defendants Economou, Khanna and DryShips Board; (iii) Section 11 of the Securities Act of 1933 (the "Securities Act") against DryShips, Economou, Nakhleh, DryShips' Board and the Underwriter Defendants; (iii) Section 12(a)(2) of the Securities Act against DryShips and the Underwriter Defendants; (iv) Section 15 of the Securities Act against Economou, Khanna, Nakhleh, and the DryShips Board; and for (v) breach of fiduciary duty against DryShips, Economou, Khanna, Nakhleh and DryShips Board; and (vi) for breach of fiduciary duty against Underwriter Defendants.


## II.    JURISDICTION AND VENUE

15.     The claims asserted herein arise under (i) Sections 10(b) and 20(a) of the Exchange

Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and SEC Rule 14a-9, 17 C.F.R. § 240.10a-9 ("Rule 14a-9"), and (ii) Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o.

16.    This Court has jurisdiction over the subject matter of this action pursuant to (i) Section 27 of the Exchange Act 15 U.S.C. §78aa; (ii) Section 22 of the Securities Act, 15 U.S.C §77v; and (iii) 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

17.    In addition, jurisdiction is proper over Plantiff' state law claims as the Court has supplemental jurisdiction over state-law claims in cases which derive from a "common nucleus of operative fact." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 349 (1988).

18.    Venue is proper in this judicial District pursuant to (i) Section 27 of the Exchange Act, 15 U.S.C. §78aa; (ii) Section 22(a) of the Securities Act, 15 U.S.C. §77v; and (iii) §1391(b),(c) and (d). Many of the Acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

19.    In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone, internet communications and the facilities of the National Association of Securities Dealer Automated Quotation system (NASDAQ).


## III.    **PARTIES**

### A. **Plantiff**

20.      Plaintiff purchased DryShips stocks December 2008 through and including December 2010, as set forth in the accompanying certification and incorporated by reference herein, and have been damaged thereby.

### B.  Defendants

### 1.  Corporate Defendants

21.      Dryships Inc. ("DryShips") is a Marshall Islands corporation with its principal executive offices in Athens, Greece. DryShips incorporated in 2004 and went public in February 2005 on NASDAQ.  DryShips is one of the largest drybulk companies in its fleet size and revenue and the second largest Panamax owner in the world.  As of April 12, 2011, DryShips owned, through its subsidiaries, a fleet of 35 drybulk carriers comprised of seven Capesize, 26 Panamax and two Supramax vessel, and had contracts for two Panamax newbuilding drybulk carriers scheduled for delivery in the fourth quarter of 2011 and the first quarter of 2012. The drybulk fleet primarily carries a variety of drybulk commodities including major bulk items such as coal, iron ore, and grains, and minor bulk items such as bauxite, phosphate, fertilizers and steel products. DryShips also owns and operates two ultra-deepwater (UDW) semi-submersible drilling rigs and two ultra-deep water drillship.

### 2.  Officer and Board Defendants

22.      George Economou (Economou) has served as the President and CEO of DryShips since its incorporation in 2004.  Economou has over 30 years of experience in the maritime industry. Economou has overseen the company's growth into one of the largest drybulk companies.  He is a member of ABS Council, Intertanko Hellenic Shipping Forum and Lloyds Register Hellenic Advisory Committees.

23.     Pankaj Khanna (Khanna), became DryShips COO in March 2009.  Khanna is also a director of Ocean Rig UDW.  He has 21 years of experience in the shipping industry.  Prior to joining DryShips, Khanna was the Chief Strategy Officer for Excel Maritime Carriers Ltd.  He also served as Chief Operating Officer of Alba Maritime Services S.A., Vice president of Strategic Development at Teekay Corporation, Senior Analyst at SSY, and sailed on merchant vessels as a deck officer.

24.     Ziad Nakhleh (Nakhleh), DryShips Chief Financial Officer (CFO), was appointed in November 2009. Nakhleh has over 12 years of finance experience.  He served as Treasurer and Chief Financial Officer of Aegean Marine Petroleum Network Inc.  He also consulted various companies in the shipping and marine fuels industries.  Before his employment with Aegean, Nakhleh was employed with Ernst & Young and Arthur Andersen in Athens.

25.     Niki Fotiou (Fotiou) has served as DryShips Senior Vice President Head of Accounting and Reporting since January 2010.  From 2006-2009, Fotiou served as the Group Controller of Cardiff Marine Inc.  Prior to her employment with Cardiff, from 1993-2006 Fotiou worked for Deloitte and for Hyatt International Trade and Tourism Hellas.

26.     George Demathas (Demathas) was appointed to DryShips board of directors on July 18, 2006. He was also a director of Ocean Rig ASA from 2008-2010.  Since 2001, Demathas has served as Chief Executive Officer and a director of Stroigasitera Inc.  Since 1991, Mr. Demathas has been involved in Malden Investment Trust Inc. Mr. Demathas was a principal in Marketing Systems Ltd.

27.     George Xiridakis (Xiridakis) was appointed to DryShips board of directors in May 2006. He was also a director of Ocean Rig UDW.  Xiridakis has been the Managing Director of XRTC Business Consultants Ltd.  Xiridakis is also the advisor of various shipping companies, as well as

international and state organizations.  He also serves as the General Secretary of the Association of Banking and Shipping Executives of Hellenic Shipping.  He has served on the board of directors of Paragon Shipping Inc since 2008 and from 2008-2009  Xiradakis was a member of the board of directors of Aries Maritime Transport.  He also served as a President of the Hellenic Real Estate Corporation and Hellenic Nations Center of Port Development.

28.     Evangelos Mytilinaios (Mytilinaios), has served on the DryShips' board of directors of since December 19, 2008. Mytilinaios has over 20 years of experience in the shipping industry. He served as a senior executive in the Peraticos and Inlessis Group of Companies. Mytilinaios also heads a group of companies involved in tourism and real estate development in Greece and the United Kingdom.

29.     Harry G. Kerames (Kerames), was appointed to DryShips' board of directors on July 29, 2009.  Kerames has over 21 years of experience in the transportation industry serving as the Managing Director of Global Capital Finance.  He was also the Chief Marketing Officer at Charles R. Weber Company Inc. He has held various directorships, senior level marking positions, and consultative roles with Illinois Central Railroad, Genstar Corporation, Motive Power Industries, Hub Group Distribution Services, and Ship and Transportation Equipment Finance and Oceanfreight Inc.  He is a member of the Baltic Exchange, the Hellenic American Chamber of Commerce, and the Connecticut Maritime Association.

30.     Vasselis Karamitsanis (Karamitsanis), is member of the DryShips' board of directors since July 29, 2009.  Karamitsanis is an attorney and a founding partner of SigmaKappSigma Law Offices.  From 2007-2009, Karamitsanis was the head of the legal department at Karouzos Construction and Development Group.  Karamitsanis previously served as a legal advisor to Dimand Real Estate Development and LPSA Consultants S.A. and has served as a special

advisor to the Hellenic Ministry of Health and Welfare. He is a member of the Athens Bar Association.

31.     Chryssoula Kandylidis (Kandylidis) has served as a member of DryShips board of directors since March 5, 2008. She is the beneficial owner of all the issued and outstanding capital stock of Prestige Finance S.A. Kandylidis has previously served as an advisor to the Minister of Transportation and Communication in Greece.

32.     Fotiou, Demathas, Xiridakis, Mytilinaios, Kerames, Karamitsanis, Kamdylidi, are collectively referred "DryShips Board" or "DryShips Board Defendants".

### 3.   The Underwriter Defendants

33.     Defendant Deutsche Bank AG ("Deutsche Bank"), was an underwriter for numerous stock offerings of common shares of DryShips.

34.     Defendant Merrill Lynch & Co., Inc. ("Merrill"), a current subsidiary of Bank of America, was an underwriter for the ATM Equity Sales Agreement, offering up to 500.0 million common shares of DryShips.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   DRYSHIPS Code of Conduct

35.     DryShips holds itself out to its customers, suppliers and shareholder, as an epitome of corporation with a strong commitment to ethical business practices. DryShips has implemented a Code of Ethics & Conduct (the "Code"). According to DryShips, the Code establishes rules and standards regarding behavior and performance, and applies to all affiliates of DryShips, its employees, directors, officers and agents. The Code is published on DryShips webpage and states as follows:

Dryships Inc. (the "Company" or "Dryships") has a strong commitment to promoting honest conduct and ethical business conduct all employees (as defined below) and compliance with the laws that govern the conduct of our business worldwide. We believe that a commitment to honesty, ethical conduct and integrity is a valuable asset that builds trust with our customers, suppliers, employees, shareholders and the communities in which we operate.   To implement our commitment, we have developed a code of business ethics and conduct (the "Code").

36.     The Code expressly states that actual or apparent conflicts of interest between personal and professional relationships must be avoided and shall be handled ethically. Pursuant to the Code,

A conflict of interest exists if actions by any Employee are, or could reasonably appear to be, influenced directly or indirectly by personal considerations, duties owed to persons or entities other than the Company, or by actual or potential personal benefit or gain.

37.     The Code further pledges that violations of rules of conduct will not be tolerated and DryShips *"will subject those responsible to disciplinary action."* (emphasis added).

**B.   George Economou exhibits disdain for the shareholders and engages in self-dealing.**

38.     Economou is a man well-versed in maritime technology. He first came to America to attend Massachusetts Institute of Technology (MIT); he graduated in 1976 with two masters of science degrees, one in naval architecture and marine engineering, another in shipping and shipbuilding management. According to news sources, he spent time at shipping outfits in New York before returning to Greece and buying his first ship in 1986.

39.     Economou returned to New York in 1998 to raise $175 million in junk bonds to expand his fleet with a company called Alpha Shipping Plc ("Alpha"). According to a February 25, 2008 article Forbes Magazine, entitled *"Curious George,"* within one year Alpha defaulted, failing to make an interest payment. According to the same article, Economou struck a deal in bankruptcy court that let him pay creditors 37 cents on the dollar and left him in possession of most of his fleet.

40.     Since 2004, Economou served as Chairman, President and CEO of DryShips. In February of 2005, Economou listed DryShips on the NASDAQ.

41.     Notably, in a February 28, 2005 article entitled *The Golden Fleece?* in response to a question regarding his decision to raise money in the American public securities markets, Economou is quoted as saying that ***"Americans are the dumbest investors around, and there are lots of liquidity in this market."*** (emphasis added).

42.     In 1991 Economou founded a privately held Cardiff. As was reported by DryShips, in the 2010 Annual Report on Form 20-F filed with the SEC, all drybulk carriers of DryShips are managed by Cardiff, under separate ship management agreements. Cardiff "is responsible for all technical and commercial management functions of [DryShips'] drybulk fleet." In the same SEC filing, DryShips reported that 70% of the issued and outstanding capital stock of Cardiff is owned by foundation which is controlled by Economou. The remaining 30% of the issued and outstanding capital stock of Cardiff is owned by a company controlled by Economou's sister, Chrysoula Kandylidi, who is also a member of DryShips' board of directors.

43.     In September, 2008 the world witnessed one of the most astonishing stock market crashes. The market crash ultimately triggered a global recession.

44.     As a result of the recession, the liquidity of the market was demolished and global recession also took its toll on shipping industry. Spot charter rates plummeted and shipping spot market came to a standstill. Baltic Dry Index (BDI) fell a staggering 70% during the month of October 2008. Changes in the BDI can give investors insight into global supply and demand trends. This change is often considered a leading indicator of future economic growth (if the index is rising) or contraction (index is falling) because the goods shipped are raw, pre-

production material, which is typically an area with very low levels of speculation. By the end of 2008, BDI plunged from 11,793 points to 663 in December of 2008, sustaining a 94% drop.

45.     It is evident that DryShips was not immune to the economic crisis of 2008. Prior to the market collapse, on July 3, 2008, DryShips issued a press release announcing $400.0 million acquisition of four Panamax dry bulk vessels from companies beneficially owned by Economou. While DryShips claimed that the vessels were obtained on terms that "are comparable to those that may be obtained from an independent third party," the market and the shareholders were nevertheless outraged by the inflated price. Subsequently, after the September market crash DryShips faced difficulties getting financing for the controversial $400.0 million transaction.

46.     Prior to securing financing for the aforementioned vessel acquisition, on October 6, 2008, DryShips announced a "strategic expansion", purchasing nine large dry-bulk ships from Economou's private fleet. DryShips issued a press release stating that it has entered into agreements to take over the equity interests of single purpose companies (SPCs) from entities controlled by clients of Cardiff, including those controlled by Economou. DryShips agreed to pay to the sellers $689.6 million in exchange for the shares the SPCs. The payment was to be made in the form of 19,431,840 newly issued shares of DryShips common stock. In addition, DryShips agreed to assume $216.3 million of existing debt and $262.0 million in remaining shipyard installments related to these vessels.

47.     Then, on December 10, 2008, DryShips also announced that it failed to get bank financing for a $400.0 million transaction announced in July of 2008.  DryShips eneded up cancelling the purchase of four Panapax vessels paying generous penalties to Cardiff. Upon cancellation, the sellers retained the deposits totaling $55.0 million. DryShips paid an additional $105.0 for the cancellation as well as an exclusive option to buy the ships for $160.0 million.

According to December 12, 2008 article in Wall Street Manna, titled *"George Economou Steals $160,000,000 From DryShips,"* DryShips paid its Chairman $160.0 million, "to have an option of buying ships for $160.0 million." Other news sources noted that the cancelled ships may or may not be worth collectively $160.0 million today. The option expired on December 31, 2009.

48.    At the same time, in December 2008, a mere two and a half months after announcing this "strategic expansion," DryShips also announced that it has agreed to cancel the purchase of nine dry-bulk ships, paying large penalties to Cardiff. DryShips reported to the SEC that the consideration to cancel the transaction shall consist of the issuance of 6.5 million of DryShips common shares to entities that are unaffiliated with DryShips and nominated by third-party sellers.

49.    In addition, in consideration for this second cancellation, entities controlled by Economou received 3.5 million warrants with strike prices, depending on the relevant tranches, of between $20.0 to $30.0 per share. Each warrant has a cost of $0.01, and entitles the holder to purchase one share of common stock and will vest over and 18-month period, and will expire after five years. This means that entities controlled by Economou will pay $35.0 thousand for 3.5 million common shares of DryShips.

50.    Although, as Jefferies (an equity firm) analyst Doug Mavrinac pointed out in March 25, 2009 article in Forbes Magazine, entitled *"DryShips Dark Days,"* this agreement cancellation "significantly reduces [DryShips] capital expenditures going forward" and "enables DryShips to not go through with an obligation to purchase an asset that is now worth about half what it was when they signed the agreement," the issuing of 6.5 million DryShips shares diluted current shareholders. Jeffrey Landsberg, a freight options broker at Imarex, went as far as stating that

"*DryShips is looking out for the best interests of Economou and his private entities*" (emphasis added). (Forbes.com article, "DryShips Drowns Investors" ).

51.     Defendants, Economou and the Board entered into agreements to purchase nine vessels with knowledge or reckless disregard of the DryShips financial state and volatile market conditions. They were aware, or should have been aware, long before they announced a nine ship ship expansion that DryShips would be unable to proceed with the purchase of nine Capesize dry bulk carriers:

a.  Effective May 30, 2007, Economou was appointed by the DryShips Board as the interim chief financial officer (CFO). As interim CFO, chairman of the board and a 34% owner of DryShips, Economou knew true financial condition of DryShips.

b.  Furthermore, in a press release described at ¶46 Economou acknowledged that DryShips was operating in stagnant market condition and DryShips competitors were "constrained by difficult credit environment."

c.  Only about a month after announcing the nine ship expansion of its fleet, on November 5, 2008, DryShips made a move to register up to 25 million new shares in a prospectus filed with the SEC. Among risk factors included in this filing DryShips stated that even with an injection of fresh equity from the sale of new shares "it cannot be assured" that operating and capital needs would be satisfied, or that it would remain in compliance with debt covenants "if the low charter rates in the dry bulk market continue." The prospectus further revealed that DryShips was expecting a decrease in earnings due to the low charter rates in the drybulk market:

i.  Purchasers of the shares we sell, as well as our existing shareholders, will experience significant dilution if we sell shares at prices significantly below the price at which they are invested.

ii.   Due to current the current conditions in the financial markets, we will likely not be able to invest these proceeds at rates of return at which we have been able to invest per capital in the past. In addition, if the current low charter rates in the drybulk market continue, the 15 vessels that we charter in the spot market will earn less than they have earlier this year. As a result, our earnings per share will tend to decrease and remain at decreased levels until we use the proceeds for debt repayment or vessel acquisition when warranted by drybulk carrier market conditions and/or when conditions in the drybulk and financial markets improve.

52.    Therefore, from the above facts, it follows that Economou and the Board entered into the October 6, 2008, agreement to purchase through Cardiff, nine vessels from Economou's private fleet, with reckless disregard for the interests of DryShips and its shareholders, and with a primary goal of allowing Defendants, Economou and Kandylidi, to secure 3.5 million shares of DryShips at prices between $20 and $30 per share.

## C. DryShips Enters the UDW Segment, Economou Reaps Profits, and DryShips Khanna and Nakhleh promote two-for-one deal

53.    On October 8, 2008, in a press release, DryShips announced that in addition to purchasing nine Capesize drybulk carriers, it was also entering the offshore drilling segment. Economou boasted that DryShips was entering an industry that has "solid prospects for the next three to five years."

54.    This venture was marked by procurement of two UDW vessels. Primelead, a 100% wholly owned subsidiary of DryShips, has entered into an agreement to take over equity interests of a holding company which owns two advanced capability UDW drillships, which are controlled by clients of Cardiff, including Economou. In consideration for the drillships, the sellers, including Economou, received 25% of all the then issued and outstanding shares of Primelead. Primelead was later renamed Ocean Rig UDW.

55.    As Primelead entered into an agreement to acquire the UDW vessels, Primelead assumed $252.3 million of existing debt and approximately $1.0 billion in remaining shipyard

17

installments relating to these drillships. By entering into an agreement to acquire vessels from Cardiff, DryShips assumed a large amount of debt, shifting the burden from a corporation privately held by Economou to DryShips and its shareholders.

56.     In the press release, Economou stated that DryShips intends to spin off Primelead to its shareholders in the form of a share dividend. Further, he misleadingly promised that DryShips intended to file the necessary documents with the SEC within "the next few weeks and to complete the spin off either during the 4th quarter of 2008 or the 1st quarter of 2009 subject to SEC review." However in order to complete the spin-off process, DryShips needed to secure charters and financing to cover the $1.0 billion in shipyard payments. Due to lack of financing and charters, it was not feasible for DryShips to complete the spin-off. Moreover, all throughout the 4th quarter of 2008, and 2009 and 2010, Economou and then Khanna continued to feed DryShips shareholders with empty promises of spin-off. Khanna has indicated during October 27, 2009, Third Quarter Earnings Conference Call, DryShips was in fact considering the IPO option.

57.     In 2009 and 2010 calendat years DryShips continued to mislead the investing public about the spin-off in a number of SEC filings. On May 7, 2009, DryShips filed a prospectus supplement with SEC which incorporated by reference DryShips annual report on Form 20-F/A. This report provided that DryShips "*will spin-off Primelead to [its] shareholders by means of distribution to [its] shareholders of one share of Primelead for each of [its] outstanding common shares [...]*" (emphasis added). Then, on Novemebr 19, 2009 DryShips followed up on this share-per-share promise in another prospectus supplement filed with SEC stating, "*[we] will spin-off Primelead to our shareholders by means of distribution to our shareholders of one share of Primelead for each of our outstanding shares, or the Spin-Off.*" (emphasis added).

Prospectus supplement filed with SEC on April 21, 2010 also continued to mislead, *"[we] will spin-off Primelead to our shareholders by means of distribution to our shareholders of one share of Primelead for each of our outstanding shares, or the Spin-Off."*

58.    In addition to these false and misleading filings with SEC, Khanna has continued to promote DryShips stock in the press as a great buy, a two-for-one deal, because by purchasing DryShips stock, investors were also "buying a free option on [his] drillships." Based on DryShips, Economou and Khanna's false representations regarding the IPO, DryShips shareholders paid an inflated market price for DryShips common stock.

59.    Defendants, DryShips, Economou and Khanna announced spin-off and/or IPO plans with knowledge and/or reckless disregard of the DryShips inability to secure financing and/or charters. Defendants, DryShips, Economou and Khanna promised shares of Primelead / Ocean Rig UDW, and promoted the two-for-one deal with knowledge and/or reckless disregard of the DryShips inability to issue a share of spin-off entity per share of DryShips common stock to every DryShips' shareholder. They were aware or should have been aware that it will be impossible for DryShips to complete the spin-off and/or come out with an IPO during "4th quarter of 2008 or the 1st quarter of 2009," or at any point in time in 2009 or 2010. Furthermore, they were aware or should have been aware that it will be impossible for DryShips to distribute a share of Primelead / Ocean Rig UDW for each share of DryShips stock. The primary goals of the mythical spin-off/IPO was to (i) alleviate financial burden on Cardiff and allow Economou to profit by securing shares of Primelead, (ii) deceive analysts and investors into believing that DryShips common stock has significantly more positive value, (iii) induce investors to buy and/or hold DryShips common stock in order to profit from the new IPO.

60.      The ultimate fate of the spin-off/IPO demonstrates that drillship spin-off (Ocean Rig UDW) was simply a ploy to artificially inflate the price of DryShips shares. DryShips was unable to secure financing for the shipyard installment payments. While back in October 6, 2008 press release announcing the spin-off, Economou stated that DryShips will not raise equity to fund the drillships spin-off, DryShips continued to raise equity by means of common stock offerings and then used the equity raised to fund the newbuilding drillships it purchased from Economou. Thus, Economou satisfied the debts of his privately held corporation at the expense of DryShips shareholders. Furthermore, DryShips shareholders did not receive shares of the drillships IPO, as promised by Economou and Khanna. In a September 22, 2011 press release, DryShips announced details of "partial spin-off of Ocean Rig UDW Inc." On September 21, 2011 DryShips had over 408 million common shares outstanding. While DryShips shareholders were promised a share of the spin-off entity for every share of DryShips they held, DryShips stated that it "*will distribute 2,967,359 common share of Ocean Rig UDW [spin-off entity] on a pro rata basis, or 0.007266 common share of Ocean Rig UDW for every one share of common stock of DryShips.*" (emphasis added). Moreover, DryShips announced in the same press release that

> [...] fractional shares of Ocean Rig UDW common stock will not be distributed to DryShips' shareholders. ***Instead, fractional shares of Ocean Rig UDW will be aggregated and sold in the open market,*** with the net proceeds distributed pro rate in the form of cash payments to DryShips' shareholders who would otherwise be entitled to receive a fractional share of Ocean Rig UDW common stock. (Emphasis added).

**D.   Economou Misrepsents DryShips' True Financial Condition, DryShips Breaches Loans, Public Offerings Devalue DryShips**

61.      On November 5, 2008, DryShips filed a prospectus with the SEC, registering 25 million new shares. (SEC prospectus ¶51(c)). According to Lowly, shares of DryShips plunged by approximately 20% following the SEC filing.

62.    Among the risk factors described at ¶51(c),  the prospectus are stated as follows:

> We will not be assured that we will be able to raise equity and debt financing sufficient to meet our capital and operating needs and to remain in compliance with our loan covenants, if the current low charter rates in the drybulk market continue. In such case, we may not be able to raise additional equity capital or obtain additional debt financing or refinance our existing indebtedness if necessary. If we are not able to comply with our loan covenants and our lenders chose to accelerate our indebtedness and foreclose their liens, we could be required to sell vessels in our fleet and our ability to continue business would be impared.

63.    In an article by Nigel Lowly of Lloyds List, entitled "*Economou Allays Fears as DryShips Shares Fall*," published on November 7, 2008, Economou was quoted falsely assuring investing public a day after the prospectus was published, "The underwriters put in a lot of risk factors to safeguard our backs against litigation. *We are not breaching any covenants and we are not at risk of breaching covenants. Now are we planning on breaching them*" (emphasis added).

64.    In the same interview, Economou further reassured investors and shareholders, by emphasizing that DryShips is in "strong financial condition," with cash assets of $456.0 million and another $1.2 billion in committed bank lines, adding up to $1.7 billion in total liquidity.

65.    Furthermore, Lowly's article quotes Economou addressing the potential sale of 25 million shares, "I want to have cash to use it as a cushion or as firepower," he said.

66.    Despite statement by Economou that DryShips has $1.7 billion in total liquidity, on December 10, 2008 DryShips announced that it was cancelling transactions for purchase of four Panamax vessels and nine dry-bulk ships, addressed in detail at ¶47-52.

67.    On January 22, 2009, DryShips and its Board suspended the company common share dividend starting from the fourth quarter 2008.

68.     As of today the correct date of breach of loans is unknown, as DryShips has not disclosed the exact date of breach; the first mention of breach of loan covenants was published in SEC filing on January 29, 2009.

69.     On January 29, 2009 DryShips reported in the SEC filing:

> Two of our leading banks, which collectively held $751.8 million of our indebtedness as of December 31, 2008, have notified us that we are in breach of certain financial covenants contained in our loan agreements, and we have been in communication with another lender that currently holds $650 million of our outstanding indebtedness regarding breach of loan covenants. Currently, we are in discussions with these and other lenders for waivers.

70.     On February 3, 2009 DryShips reported in an SEC filing that it had reach deal to restructure $168.0 million dollar with Piraeus Bank.

71.     On February 9, 2009 DryShips announces it has reach final agreement with Nordea Bank for a covenant waiver on the $800.0 million Primelead Facility.

72.     On May 19, 2009 reach a waiver on a loan for 86 million with Dnb NOR.

73.     On June 9, 2009 reached a waiver with the Deutsche Bank for $1.125 billion for Drillship.

74.     On August 10, 2009 reached a waiver for $71.0 million debt with West LB.

75.     On October 1, 2009 reached a waiver for $116.0 million with Nord LB.

76.     On November 4, 2009 reached a waiver Commerzbank for $70.0 million debt.

77.     On November 17, 2009 reached a waiver with Deutsche Schiffsbank for $117.5 million.

78.     As DryShips was breaching its loan covenants and reaching waiver agreements, paying large penalties to aforementioned financial institutions, DryShips began raising equity by means of equity offerings.

    a. On November 16, 2008 DryShips registered 25 million common shares for equity offering and yielding net proceeds of $167.0 million.

b. On January 28, 2009, DryShips entered into an ATM Equity Sales Agreement with Merrill Lynch ("Merrill"), Pierce, Fenner & Smith Incorporated ("Fenner & Smith") relating to the offer and sale of up to $500.0 million of DryShips common shares.

c. On March 19, 2009 DryShips issued 11,990,405 common shares to the nominees of Central Mare Inc. in connection with the disposal of three new building Capesize vessels.

d. On April 2, 2009 DryShips issued 24,404,595 common shares. The net proceeds amounted to $116.0 million.

e. On May 7, 2009 DryShips sold 69,385,000 of common stocks for $475.0 million dollars; Merrill acted as the underwriter in this transaction.

f. On July 29, 2009, **Econemou received 52,238,806 shares of preferred stocks and 50.0 million in cash in exchange for the remaining 25% of the total issued and outstanding capital stock of Ocean Rig UDW (previously known as Primelead).**

g. In November 2009, DryShips offered $460.0 million of 5% convertible senior notes, net resulting in net proceeds of $447.8 million dollars. At the same time, DryShips also offered 26,100,000 common shares to Deutsche Bank., AG, London Branch.

h. In April 2010, DryShips issued $240.0 million aggregate principal amount of notes, net resulting in net proceed of $237.2 million. Concurrently, DryShips also offered up to 10.0 million common shares to loan to Deutsche Bank., AG, London Branch.

i. In September 2010, DryShips filed another registration statement with SEC and a prospectus supplement relating to the offer and sale of up to $350.0 million shares of common stock pursuant to the sales agreement with Deutsche Bank Securities Inc. The net proceeds amounted to $342.

79.     Numerous share offerings had a negative effect on DryShips shareholders of common stock as the shareholders experienced significant dilution from the sale of shares at prices significantly below the price at which they are invested.

80.     Defendants, Economou, Khanna, Nakhleh, Fotiou and the Board acted with reckless disregard for the interests of DryShips shareholders when the breached loan covenants and raised equity to pay additional purchased and "strategic expansions," ultimately diluting the value of DryShips common stock. Defendant acted with reckless disregard for the shareholder interests, using equity raised to finance newbuilding drillships purchased from Economou. DryShips was able to complete the spin-off, discussed at ¶¶ 56-60, at shareholders' expense, while issuing materially false and misleading statements, leading shareholders to believe that they will receive a share of the Ocean Rig UDW for every share of DryShips they hold.

## V.     FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

### A.   Economou's statements on November 7, 2008 in Lloyds List article.

81.     In an article by Nigel Lowly of Lloyds List, a shipping industry newspaper, entitled *"Economou Allays Fears as DryShips Shares Fall,"* published on November 7, 2008, Economou was quoted saying, "The underwriters put in a lot of risk factors to safeguard our backs against litigation. *We are not breaching any covenants and we are not at risk of breaching covenants. Now are we planning on breaching them*" (emphasis added).

82.     This statement came days after DryShips filed a prospectus with SEC, registering 25 million new shares. (SEC prospectus, ¶51(c)). The prospectus described a number of risk factors and stated:

> We will not be assured that we will be able to raise equity and debt financing sufficient to meet our capital and operating needs and to remain in compliance with our loan covenants, if the current low charter rates in the drybulk market continue. In such case,

we may not be able to raise additional equity capital or obtain additional debt financing or refinance our existing indebtedness if necessary.

83.    The days after the aforementioned prospectus was filed with SEC and the news reached the investing public, the price of DryShips common stock shares dropped by approximately 20%.

84.    Economou's statements in the article described in ¶¶ 63-65, were highly material to shareholders because they gave assurance to DryShips shareholders that DryShips was in stable financial condition.

85.    Less than two months thereafter DryShips breached its loan covenants.

86.    Economou's statement regarding DryShips' ability to comply with the covenants contained in the loan agreements is materially false and misleading because (i) effective May 30, 2007, Economou was appointed by the DryShips Board as the interim CFO and thus (ii) as interim CFO, chairman of the board and a 34% owner of DryShips, Economou knew true financial obligations of DryShips. Furthermore:

a.    Economou possessed direct knowledge that only thirty days earlier, on October 6, 2008, DryShips entered into an agreement to purchase nine ships from Cardiff, a company owned by Economou and his sister, who is also a member of DryShips' board of directors. This agreement was described in detail in ¶46. Economou knew that by entering into the purchase agreement with Cardiff, DryShips assumed over $478.0 million in debt.

b.    Economou also possessed direct knowledge that, as was announced in October 6, 2008 press release, Primelead, a 100% wholly owned subsidiary of DryShips, entered into a share purchase agreement to acquire the equity interests of a holding company which owns two advanced capability drillships for use in ultra deep water drilling (UDW) locations which are controlled by clients of Cardiff, including Economou. As a result of

25

this agreement, as Economou was well aware, Primelead assumed $252.3 million of existing debt and approximately $1.0 billion in remaining shipyard installments relating to these drillships.

c. Furthermore, Economou knew that banks were not extending credit lines to drybulk shipping companies and it will be extremely difficult for DryShips to obtain additional loans. In a November 6, 2008 interview with *Fox Business*, only a day prior to his effort to appease DryShips shareholder, Economou stated that market for DryBulk shipping is "suffering because of the lack of credit." He further continued saying that "banks are not offering credit for the commodities to be moved."

It follows, that as the chairman of the board, CEO and the interim CFO, Economou had in depth understanding of the financial predicament of DryShips and knew that DryShips was overextended and may not be able to comply with its loan covenants.

87.    Moreover, Economou's statements regarding DryShips ability to comply with loan covenants were materially false and misleading because (i) DryShips prospectus filed with SEC, discussed in detail at ¶51(c), suggested that DryShips may not be "able to raise equity and debt financing sufficient to meet [DryShips] capital and operating needs and to remain in compliance with [DryShips] loan covenants and (ii) by the end of January, 2009 DryShips breached its loan covenants; in a filing with SEC DryShips stated that two banks collectively holding $751.8 million of its indebtedness as of December 31, 2008, notified it that it was in breach of certain financial covenants contained in the loan agreements.

**B. DryShips and Economou Promise Free Shares of Spin-Off Entity to DryShips Shareholders**

88.    On October 6, 2008, DryShips announced in a press release that Primeland, a 100%

wholly owned subsidiary of DryShips, entered into a share purchase agreement to acquire the

equity interests of a holding company which owns two advanced capability drillships for use in

UDW locations which are controlled by clients of Cardiff, including Economou.

89.    As DryShips and Economou planned to list the new entity (Ocean Rig UDW) on U.S.

stock exchange, he made materially false and misleading statements, promising to spin-off the

new entity to DryShips shareholders as a dividend in the first quarter of 2009.

90.    On October 6, 2008, in a press release, DryShips informed shareholders of the spin-off

arrangement and Economou misleadingly commented,

> We expect to file the necessary documents with the SEC within the next few weeks and
> to complete the spin off *either during the 4th quarter of 2008 or the 1st quarter of 2009
> subject to SEC review.* (Emphasis added).

91.    On October 9, 2008, in an interview with Barry Parker of BDP1 Consulting, entitled

"*George Economou, Chairman and CEO of Dryships, Sets the Record Straight,*" Economou

misleadingly stated:

> This is really a simple process which is *only subject to SEC approval* and not the broader
> state of the markets. After we file all appropriate documents with the SEC, and once
> approved we will spin-off the entity to our shareholders as a dividend. We hope to do so in
> *the fourth quarter of 2008 or in the first quarter of 2009*. This is not an IPO, as we will
> not raise any new equity. *Simply each shareholder in DryShips as of the record date will
> end up owning a share in DryShips and a share in the new spun-off entity*, which they
> can keep or sell on a U.S. stock exchange, and the market will then determine the ultimate
> value of those shares. (Emphasis added).

92.    Then, in 2009 and 2010 DryShips filed three prospectus supplements with SEC,

discussed in detail at ¶¶8-9 and ¶57, which promised shares of the spun-off entity. All three

prospectus supplements and/or documents incorporated by reference therein stated, "*[we] will*

*spin-off Primelead to our shareholders by means of distribution to our shareholders of one share of Primelead for each of our outstanding shares, or the Spin-Off."* (Emphasis added).

93.     DryShips press release, prospectus supplements filed on May 7, 2009, November 19, 2009, April 21, 2010 and the documents incorporated therein, as well as Economou's statements regarding the new spin-off entity were materially false and misleading because:

    a.   First, the press release and the October 9, 2008 interview concealed that DryShips was yet to obtain financing for the $1.1 billion of installment payments for the two vessels. Only in the 2009 Annual Report on Form 20-F filed with SEC did DryShips report that it has not obtained financing for the pre-delivery installment payments, which amounted to 70% of the purchase price of drillships. DryShips also acknowledged in the report that if the financing is not obtained it may default under the purchase contracts. In case of default, contracts for purchase of drillships would be cancelled by sellers.

    b.   Second, Economou misleading stated that DryShips was not looking to do an IPO option. As evidenced by Khanna's statement during October 27, 2009, Third Quarter Earnings Conference Call, DryShips was in fact considering the IPO option. "[…] we believe that the IPO option is better in terms of realizing value than it is just in terms of giving dividends," Khanna said. Where DryShips was looking to come out with an IPO, DryShips still needed to get two charters, which are contracts under which the company rents out the vessels to oil-exploration concerns, to satisfy the minimum requirement for doing an IPO. As the COO of DryShips, Khanna was quoted in March 25, 2010 article by Scott Eden, entitled *"DryShips COO Talks Drillships IPO,* "the time table for [public offering] is still based on getting two charters."

c.  Third, as evidenced by the ultimate fate of the IPO, DryShips did not issue shares of OceanRig UDW until October 5, of 2011. Furthermore, as it became evident from the September 22, 2011 press release, it was not feasible for DryShips to issue a share of the spin-off entity per every share of common stock of DryShips. On Septmber 21, 2011, DryShips had more than 408 million outstanding common shares. In the September 22, 2011 press release, DryShips announced that it will distribute 2, 967,359 common share of Ocean Rig UDW [spin-off entity] on a pro rata basis, or 0.007266 common share of Ocean Rig UDW for every one share of common stock of DryShips. Furthermore, DryShips shareholders would not be able to keep the share of Primelead as they were led to believe in the aforementioned documents and statements, because the shares would be sold on the open market, and only then the proceeds would be distributed to DryShips shareholders.

## C.  Khanna Promotes DryShips Stock by Promising Shares of Spin-Off for Free

94.    On January 29, 2010, in an interview with Jennifer Schonberger, Khanna indicated that DryShips plans to take its drillships business public in 2010.

Schonberger:  I understand you'd like to eventually separate the drillships until through spinning it off [in] an IPO. What's your timeline for that?

Khanna:        Our timeline on that is sometime this year.

95.    Khanna further promoted DryShips stock but promising a share of spin-off per share of DryShips stock:

Schonberger:  What's your case for your stock?

Khanna:        We think the company is very cheap, with the stock trading at $6 and change. We think our NAV on dry bulk and the cash alone is about $6. So when you buy DryShips at $6, you are basically getting the drill ships for

free. I think we are working to release that valuation by doing the IPO, as I told you.

96.     A March 25, 2010 article by Scott Eden mentioned in ¶93(c) also quotes Khanna advertising DryShips stock. "Whichever way you look at it today, DryShips is a very cheap buy," he said. "You are buying a free option on my drillships."

97.     Khanna's statements on January 29, 2010  were materially false and misleading because:

   a.  First, Khanna failed to disclose that DryShips still needed to get two charters to satisfy the minimum requirement for doing an IPO.

   b.  Second, Khanna concealed that DryShips still lacked financing for pre-delivery installment payments of drillships. Khanna also failed to disclose that the charters where not only needed to satisfy the IPO requirements but also to secure $1.1 billion dollar financing for the drillship installment payment.

98.     Khanna's statements published on March 25, 2010 were materially false and misleading. While Khanna mentioned that DryShips still needed to get two charters to satisfy the IPO requirement, he concealed that DryShips nevertheless lacked $1.1 billion dollar financing for the drillship installment payment.

99.     Furthermore, Khanna's statements were materially false and misleading as he knew, in his capacity as the COO of DryShips, that as described at ¶60 and ¶93, DryShips had too many outstanding common shares and would not be able to issue shares of the new spin-off entity at a one-for-one ration. In light of these facts, Khanna's statements that DryShips was a great buy were materially false and misleading because he had no basis to promise the investors free shares of the spin-off entity.

### D. Khanna Promises No Impending Equity Offering

100.   On October 27, 2009,   during a DryShips Third Quarter Earnings Conference Call, Khanna was asked by an Oppenheimer analyst Scott Burk whether DryShips plans to build up cash balance by "doing additional equity":

> Burk:   I noticed that your cash balance went down in the quarter; it looks like that's probably to make that new building payment that you'd mention during your comments. I just wondered is there are *any plans or thoughts to build that cash balance back* to $550 million by doing some additional equity, or what are your thoughts there?
>
> Khanna:   [...] At this point in time we do not have any plans to raise equity, but it's something that's on the table, and it's not something that we are willing to take off the table.

101.   The above statements by Khanna are materially false and misleading because on November 19, 2009 DryShips offered $460.0 million of 5% convertible senior notes, net resulting in net proceeds of $447.8 million dollars. At the same time, DryShips also offered 26,100,000 common shares to Deutsche Bank. In his capacity is the COO of DryShips Khanna knew of recklessly disregarded that DryShips planned to raise equity.

## VI.   SUMMARY OF SCIENTER ALLEGATIONS

102.   As alleged above, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants DryShips, Economou, and Khanna knew or recklessly disregarded that their statements set forth above were materially false and misleading when made.

103.   First, the senior executives of DryShips possessed direct knowledge that DryShips may not be able to comply with its loan covenants. As set forth at ¶86, liabilities of DryShips were well-known among DryShips' senior executives. In particular because daily operations and contractual obligations of DryShips were intimately interlinked with Cardiff. For example, Economou, who was an interim CFO, CEO and chairman of the board of DryShips, owned

approximately 34% of DryShips and 70% of Cardiff at the time of the above described series of events. Furthermore, a company controlled by Economou's sister, Kandylidi, a member of DryShips' board of directors, owned 30% of the issued and outstanding capital stock of Cardiff. Moreover, Aristidis Ionnidi, a man who served as a general manager of Cardiff back in 2008, was also a member of DryShips' Board at the time the aforementioned events took place.

104.   Second, Economou and Khanna knew or were reckless in not knowing that DryShips will not be able to come out with drillships IPO "either during the 4th quarter of 2008 or in the 1st quarter of 2009," providing them no reasonable basis to make representations about the expected benefits of the spin-off. As set forth in detail at ¶96 and ¶100, 101, these defendants knew that DryShips lacked financing and charters that would enable it to come out with a share spin-off or an IPO.

105.   Third, Economou and Khanna knew or were reckless in not knowing that DryShips will not be able to offer each shareholder in DryShips owning a share in DryShips a share of the new spin-off entity. In particular because both Economou and Khanna new that, in their capacities as the CEO and the COO of DryShips, respectively, that DryShips will not be able to issue hundreds of millions of shares of the spin-off entity. This is evidenced by the fact that as of September 21, 2011 DryShips had 408,394,836 common shares outstanding.

106.   Additional facts summarized below further establish the individual scienter of Defendants Economou and Khanna, and in turn, the corporate scienter of DryShips.

## A. Additional Evidence of Economou's Scienter

107.   In his capacity as CEO, Interim CFO and Chairman of the Board, Economou knew or recklessly disregarded that DryShips will not be able to comply with its loan covenants, as explained more fully at ¶¶88-89. Economou was highly motivated to conceal this fact from

shareholders because he knew that the market did not react favorably to the news that DryShips assumed (i) $478.0 million debt for the purchase of the nine large dry-bulk ships, and (ii) an additional $252.3 million of existing debt and approximately $1.0 billion in remaining shipyard installments relating to the drillships. In fact, DryShips' stock prices plunged in October, 2008 after DryShips announced a "strategic expansion" of its fleet and its new venture into drillship business. Furthermore, Economou's interest in camouflaging the truth was fueled by the stock market's reaction to the prospectus, discussed at ¶51(c), which suggested that (i) DryShips may not be able to raise equity and debt financing sufficient to meet its capital and operating needs, and (ii) shareholders may experience significant dilution because DryShips registered $25 million new common stock shares. Shares of DryShips dropped by about 20% as the news about the 25 million new shares broke.

108.    Consistent with these motivations, Economou made the conscious decision to conceal the information about DryShips financial health and asserted that the company is in "strong financial condition." As set forth above numerous facts establish that that these statements were false and misleading, and amounted to nothing more than an attempt to cover up the fact that DryShips was about to breach its loan covenants and instill false confidence in DryShips' shareholders.

109.    Directly contrary to the statement that drillships spin-off is a "simple process which is *only subject to SEC approval* and not the broader state of the markets," Economou, knew that the success of drillship spin-off will depend on securing financing for the drillship installment payments and charters. (Emphasis added). Economou knowingly or recklessly failed to inform shareholders that DryShips needed to secure financing and charters before the spin-off could take place because he knew that DryShips ability to secure financing and charters will strongly depend on market conditions. For example, in a press release Economou acknowledged that

DryShips competitors are "constrained by the difficult credit environment." Moreover in an interview with *Fox Business,* on November 6, 2008, Economou stated that drybulk shipping market is suffering because the banks are not offering credit for commodities to be moved. In addition, in the Lloyd's List interview, Economou acknowledged again that DryShips was navigating in unfavorable market conditions, *"no-one can tell for sure how long a bad market may last,"* he said. (Emphasis added). Then he added,

> Personally I do not think it will be bad for a very long time and I suspect China will start moving, but *we also want to be prepared for adverse market conditions*. (Emphasis added).

110.   The fact that DryShips was not able to obtain charter and secure financing and further corroborates the conclusion that in light of adverse market conditions, it was simply not feasible for DryShips to come complete the spin-off as promised. Economou was motivated to promote the spin-off of drillships because the spin-off and/or an IPO would alleviate the financial burden on Cardiff.  The privately held company was on the brink of breaching its loans, when DryShips agreed to assume the debt and shipyard payments for DrillShips. By entering into this agreement, Economou effectively transferred liability from Cardiff to DryShips and its shareholders.

111.   As another example, Economou's knowing and/or recklessly false statements regarding the spin-off, during October 9, 2008 interview with Barry Parker he stated, *"I am confident that those shareholders who have the same longer term horizon with us stand to be rewarded for their loyalty and patience."* In the same interview also state that *"[each] shareholder in DryShips as of the record date will end up owning a share in DryShips and a share in the new spun-off entity"* (emphasis added). As Economou made these statement, he knew or recklessly disregarded that shareholders awaiting the spin-off will hold and or/purchase additional shares of DryShips, driving up the value of DryShips common stock.

112.   Economou's promise of a share per share distribution of Primelead/Ocean Rig UDW in October 6, 2008 press release and the aforementioned interview were not isolated occurrences. DryShips filings with SEC provide further additional evidence of Economou's scienter. According to DryShips 2008, 2009 and 2010 annual reports, DryShips officers and Board approve and have control over all business operations of DryShips. On May 7, 2009, DryShips filed a prospectus supplement with SEC which incorporated by reference DryShips annual report on Form 20-F/A. This report provided that DryShips *"will spin-off Primelead to [its] shareholders by means of distribution to [its] shareholders of one share of Primelead for each of [its] outstanding common shares [...]"* (emphasis added). Then, on Novemebr 19, 2009 DryShips followed up on this share per share promise in another prospectus supplement filed with SEC stating, *"[we] will spin-off Primelead to our shareholders by means of distribution to our shareholders of one share of Primelead for each of our outstanding shares, or the Spin-Off."* (emphasis added). Prospectus supplement filed with SEC on April 21, 2010 also continued to mislead, *"[we] will spin-off Primelead to our shareholders by means of distribution to our shareholders of one share of Primelead for each of our outstanding shares, or the Spin-Off."* Based on the information provided in DryShips annual reports, Economou, because of his position with DryShips, had direct knowledge and control over the statements published in these prospectus supplements. Furthermore, Economou was a signatory of the prospectus supplements filed with the SEC on May 7, 2009 and November 19, 2009.

113.   As the September 22, 2011 press release indicated, even those shareholders that bought into Economou's vision for DryShips and the spin-off were not rewarded as promised. As addressed in ¶11, in the press release DryShips announced that it

> [...] *will distribute 2,967,359 common share of Ocean Rig UDW [spin-off entity] on a pro rata basis, or 0.007266 common share of Ocean Rig UDW for every one share of common stock of DryShips*. (emphasis added).

114.   As set forth above, numerous facts establish that Economou's promises of spin-off and free shares of the spin-off entity in the "the fourth quarter of 2008 or in the first quarter of 2009" were false and amounted to nothing more than a ploy to rid Economou's privately held corporation of liability, by transferring all loans and obligations to DryShips, and furthermore to deceive DryShips investors and shareholders into holding their shares and further investing in DryShips.

## B.   Additional Evidence of Khanna's Scienter

115.   During an October 29, 2009 conference call, discussed at ¶¶10-95(b), Khanna stated "Investing in DryShips is like buying an option on the Ultra Deep Water Drilling." "[...] we want to get the maximum valuation for our shareholders, so we will do the right thing at that point, whether that is an IPO or just a share spin-off," he continued. The aforementioned conference call makes it evident that Khanna had personal knowledge that charters and financing were vital to the development of UDW drilling sector and lack thereof would impede the spin-off and/or the IPO. He stated,

> [...] we are faily confident that we will have the financing in place as long as we have contracts in place. Our finance is very tight, or almost unavailable, as far as shipping is concerned, but on the offshore side there is still availability.

116.   Furthermore, in order to sell shareholders the idea of UDW drilling, Khanna falsely and/or with reckless disregard assured that DryShips will be able to obtain contracts and financing for the drillship installment payments:

> Scott Burk:   I wanted to ask you about progress in obtaining contracts for the new building drill ships, any progress there? You've mentioned some tenders coming up, but what kind of discussions are you having in terms of getting contracts for those?

Khanna:      [...] As far as our rigs are concerned, we are part of every one of those tenders but, in addition, we are also in one-on-one discussions with a couple of companies. So while I don't have a contract to announce today, but we believe that we are still in a good position to have at least one or two of the vessels in the very near term.

117.    From 2009, as the DryShips' COO, Khanna faithfully carried forth Economou's vision for the spin-off, extending the spin-off and/or IPO timeline to "sometime" in 2010. Khanna took over where Economou left off and continued to shamelessly promote DryShips as a great value for the dollar. On January 29, 2010, when Khanna had personal knowledge that DryShips still lacked charters and financing, once again he falsely and misleadingly stated that DryShips was an excellent buy because shareholders were also "buying a free option on [his] drillships."

118.    As further evidence of Khanna's scienter, Khanna knew or recklessly disregarded, in his capacity as the COO of DryShips, that that DryShips will be unable to offer free shares of DryShips to every shareholder owning a share of common stock of DryShips at the time of spin-off because, DryShips kept raising equity by issuing new common shares of DryShips. Here, it is important to note that Khanna's false and misleading statements regarding the spin-off coincided with DryShips' issuance of new shares:

a.    While during October 29, 2009 conference call Khanna stated that "investing in DryShips is like buying an option on the Ultra Deep Water Drilling DryShips" and asserted that DryShips wanted to "get maximum valuation for shareholders," shortly after his statements, in November, 2009, DryShipsShips offered $460.0 million of 5% convertible senior notes, net resulting in net proceeds of $447.8 million dollars and 26,100,000 common shares, to Deutsche Bank.

b.    Then, on March 25, 2010 Khanna again was quoted promising shareholders free shares of drillship "[w]hichever way you look at it today, DryShips is a very cheap buy," he

said. "You are buying a free option on my drillships." In addition, in an interview with *TheStreet.Com*, on March 26, 2010, Khanna falsely and misleadingly stated, ***"[DryShips] is the only shipping stock that has the potential to double. As soon as we get the charters we can execute the IPO, we could double in stock price"*** (emphasis added). In the same interview he also stated that DryShips will have a number of drillships in the next six month, indicated that as "the calculus" for an IPO, which indicate that an IPO would be executed by September 2010. Subsequently, in April 2010, DryShips issued $240.0 million aggregate principal amount of notes, net resulting in net proceed of $237.2 million. Concurrently, DryShips also offered up to 10.0 million common shares to loan to Deutsche Bank.

119.   The above mentioned facts demonstrate that Khanna's promises amount to nothing short of a ploy to deceive DryShips investors and shareholders into holding their shares and further investing in DryShips. In an interview with *TheStreet.Com* Khanna stated that DryShips was trying to build a balance by "[having] institutions in, who are value driven, who will hold the stock and therefore drive up the value." Thus, Khanna knew and/or recklessly disregarded that based on his promises of two-for-one deal, DryShips shareholders will hold and/or acquire more shares, thereby driving up the value of DryShips common stock.

120.   Consequently, above mentioned facts demonstrate that Khanna established a pattern of deceiving investors, while he had direct knowledge that DryShips will not be able to abide by its promise to issue spin-off shares at a one-to-one ratio. Furthermore, as set forth above, numerous facts establish that Khanna not only knew and/or recklessly disregarded the truth about DryShips ability to complete the spin-off and issue shares, but also engaged in a ploy to mislead

shareholders and instill false confidence in DryShips when DryShips was actively engaging in stock dilution.

## VII.   LOSS CAUSATION – EXCHANGE ACT CLAIMS

121.    For purposes of the Exchange Act claims alleged herein, Defendants' unlawful conduct alleged herein directly caused the losses incurred by Lead Plantiff and the Class. Throughout the Class Period the prices of DryShips common stock were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions. The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public. The true facts became known by investors and the markets through a series of partial corrective disclosures or by failing to reveal the falsity of all statements at one time, artificial inflation remained in DryShips common stock.

122.    As the true facts became known and/or the materialization of the risks that had been fraudulently concealed by Defendants occurred, the price of DryShips common stock declined as the artificial inflation was removed from the market price of securities, causing substantial damage to Plantiff.

123.    The decline in DryShips stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in DryShips common stock negates any inference that the loss suffered by Lead Plantiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

124.    On January 9, 2009, DryShips common stock was trading at $17.20. Lead Plantiff and other members of the Class purchased the stock at $17.20 per share. As the news of cancellation of orders and DryShips' announcement of its venture into the UDW business, as well as

allegations of Economou's self-dealing addressed in detail at ¶¶38-52, reached the media, the prices of DryShips common stock began to decline. On January 20, 2009, DryShips common stock was trading at $12.93 per share.

125.    On January 22, 2009, *www.stockwatch.com* and other news sources reported that DryShips has made a decision to cancel another vessel order. On this date, DryShips and its Board announced that the company common share dividend is suspended starting from the fourth quarter 2008.  This day, *Forbes.Com* also published an article "DryShips Drowns Investors." The article stated, "[DryShips] agreed to purchase the three new vessels for $364.0 million and backed out of that deal at a cost of $116.4 million of which $36.3 million in deposits had already been paid." In the article, also discussed at ¶50, Jeffrey Landsberg pointed out that DryShips had to give 6.5 million DryShips common shares, which diluted current shareholders. "DryShips is looking out for the best interests of Economou and his private entities." After the news, shares of Dryships stock fell a whopping 27.7% on heavy volume, falling from $12.88 to $10.49.

126.    On January 29, 2009, Interactive Investor Trading LTD, a business news agency based in London, United Kingdom, reported before the opening of United States stock markets, that DryShips breached its loan covenants. As the news reached American markets, DryShips stock dropped another 29.9%, with the value rapidly falling from $12.22 per share from the close on January 28, 2009, to $8.56 per share on January 29, 2009. This drop is value was followed by a 22.5% drop on January 30, 2009 and another 26.2% plunge on the next day of trading, on February 2, 2009. **In these three days of trading, DryShips stock value plummeted a staggering 79%.**

127.    Each of the above referenced disclosures partially corrected the false and misleading information previously made available to the market by Defendants' wrongful course of conduct.

128.   From February 2009 through December 2010, corrective disclosures had a similarly negative effect on the price of DryShips common stock. After numerous breaches of loans, waiver agreements with lenders and secondary stock offerings, as discussed at ¶¶ 68-79, DryShips stock value fluctuated between $3.00 and $6.00 per share. This price fluctuation had a direct correlation to Defendants misleading promises on the two-for-one deal, where DryShips shareholders were promised a common share of Ocean Rig UDW, per common share of DryShips stock.

129.   For the purposes of the Exchange Act claims, it was entirely foreseeable to DryShips, Economou, Khanna and the DryShips Board that concealing from investors (i) DryShips deteriorating financial condition, (ii) DryShips intent to raise equity, (iii) the circumstances surrounding the spin-off and/or IPO, including DryShips' ability to secure charters and financing, would artificially inflate the price of DryShips common stock. It was similarly foreseeable that the ultimate disclosure of this information and, in particular, the truth about DryShips' inability to comply with its loan covenants and issue a share of Primelead/Ocean Rig UDW per share of DryShips common stock, would cause the price of DryShips' securities to drop significantly as the inflation caused by their earlier misstatements was removed from stock.

130.   Accordingly, the conduct of these Defendants as alleged herein proximately caused foreseeable losses under the Exchange Act to Plantiff and members of the Class.

## VIII.   RELIANCE: APPLICABILITY OF THE FRAUD IN THE MARKET DOCTRINE FOR EXCHANGE ACT CLAIMS

131.   At all relevant times, the market for DryShips common stock was an efficient market for the following reasons, among others:

    a.   The DryShips common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   As a regulated issuer, the Company filed periodic public reports with the SEC;

c.   DryShips communicated with public investors via established market communication mechanisms, including the regular issuance of press releases through the *Business Wire* news service, and conference calls with analysts and investors; and

d.   DryShips was extensively followed by numerous securities analysts employed by major brokerage firms who wrote reports about the Company and the value of its securities that entered the public marketplace.

132.   As a result, the market for DryShips' common stock promptly digested current information with respect to DryShips from all publically available sources and reflected such information in the price of the Company's common stock. Under these circumstances, all purchasers of the DryShips' publically-traded common stock during the Class Period suffered injury through their purchase of the publically-traded common stock at artificially inflated prices, and a presumption of reliance applies.

## IX.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

133.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

134.   Many or all of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements there were no meaningful cautionary statement identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. As set forth above in detail, then existing facts contradicted Defendants' statements regarding DryShips' financial condition, the drillships spin-off and/or IPO and DryShips' ability to secure charters

and financing, as well as statements regarding DryShips' plans to raise equity through issuance of additional shares of common stock of the company.

135.    Alternatively, to the extent that the statutory safe harbor does not apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the company who knew that those statements were false when made.

## X.    CLASS ACTION ALLEGATIONS

136.    Lead Plantiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who (1) purchased or otherwise acquired the securities of DrysShips pursuant and/or traceable to the company's Registration Statement issued in connection with the company's  and (2) purchased or otherwise acquired the securities of DryShips during the Class Period. Excluded from the Class are Defendant (as defined herein), the officers and directors of the company at all relevant times, any entity in which Defendants have or had a controlling interest, and members of their immediate families and their legal representatives, heirs, successors or assigns (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

137.    The members of the class are so numerous that the joinder of all members is impracticable. Throughout the Class period, the company's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plantiff at this time, and can only be ascertained through appropriate discovery, Plantiff believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from the

records maintained by DryShips or its transfer agents, and maybe be notified of the pendency of this action by mail and emails using a form of notice customarily used in securities class actions.

138.   Lead Plaintiff' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

139.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and will retain counselors who are competent and experienced in class and securities litigation.

140.   Common questions of law and facts exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and facts common to the Class are:

(a) Whether the federal securities laws were violated by Defendant's acts as alleged herein;

(b) Whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, management of the company;

(c) Whether, solely with respect to the claims under Section 10(b) of the Exchange Act, Defendants acted with scienter;

(d) Whether, solely with respect to the claims under Section 10(b) of the Exchange Act, reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

(e) To what extent the members of the class have sustained damages, and the proper measure of damages.

141.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the class to redress individually the wrongs done to them.

## XI.   CLAIMS BROUGHT PURSUANT TO SECTION 10(b) AND 20(a) OF THE EXCHANGE ACT

### COUNT I

### For Violations of Section 10(b) of The Exchange Act and Rule 10b-5 (Against Defendants DryShips, Economou and Khanna)

142.   Plantiff repeat and re-allege each and every allegation contained above and as if fully set forth herein.

143.   During the class period, Defendants DryShips, Economou and Khanna carried out a plan, scheme and course of conduct which was intended to and, throughout the Class period, did: (1) deceive the investing public, including Plantiff and other Class members, as alleged herein; and (2) cause Plantiff and other members of the Class to purchase DryShips securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, First Claim Defendants, and each of them, took the actions set forth herein.

144.   These Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the company's securities in violation of Section 10(b) of the exchange Act and Rule 10b-5 thereunder. As detailed herein, the misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, false and misleading representations and omissions regarding DryShips' financial condition,

145.   These Defendants, directly and indirectly, by the use, means or instrumentalitieses of interstate commerce and/or of the mails, engaged and participated in a continuous course of

conduct to conceal adverse material information about the business, operation and future prospects of DryShips as specified herein.

146.   These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the company's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that were intended to, and did (i) deceive the investing public, including Plantiff and members of the class, among other things, the events that a materially adverse effect on DryShips' financial condition and its ability to comply with loan covenants, as well as the drillships spin-off and/or IPO; (ii) artificially inflate and maintain the market price of DryShips common stock; (iii) cause Plantiff and other members of the Class to purchase DryShips common stock at artificially inflated prices; and/or (iv) cause Plantiff and other members of the Class to keep DryShips common stock despite of its plunging value.

147.   These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by

overstatements and misstatements of the company's financial condition throughout the Class Period, if these Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking steps necessary to discover whether those statements were false or misleading.

148.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of securities was artificially inflated during the Class Period. In ignorance of the facts that market prices of the company's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired DryShips common stock during the Class Period at artificially high prices, and were, or will be damaged.

149.    At the time of said misrepresentation and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding DryShips financial health and the drillships IPO, Plaintiff's and other members of the Class would not have purchased or otherwise acquired their DryShips securities, or, if they had acquired such securities during the Class period, they would not have done so at the artificially inflated prices that they paid.

150.    As described above, these Defendants had a duty to disclose that DryShips may be unable to comply with its loan covenants before the breach of these covenants occurred. Furthermore, these Defendants also had a duty to disclose that DryShips will be unable to come out with

drillships spin-off and/or IPO at any point in time in 2008 or 2009 due to lack of charters and financing.

151.   There Defendants also had a duty to disclose this information because they were required to update and/or correct their prior misstatements and omissions. For example, defendants repeatedly misrepresented that the spin-off would be beneficial to DryShips shareholders and misrepresented that DryShips shareholders will receive free shares of the new entity. Defendants remained under a duty to update and correct these and their other misrepresentations. Further, by continuing to speak about the spin-off in numerous interviews, Defendants were under duty to update and correct prior misstatements and statements that had become misleading, and to speak completely and truthfully about the spin-off and/or IPO. Defendants also had a duty to disclose known trends affecting liquidity, income and revenues, including DryShips ability to comply with loan covenants and intent to raise equity by registering new shares of DryShips common stock.

152.   Defendants DryShips, Economou and Khanna are liable for all materially false and misleading statements made during the Class Period, as alleged above, including, without limitation, the false and misleading statements and omissions set forth above which appeared in the (i) article by Nigel Lowly of Lloyds List, entitled *"Economou Allays Fears as DryShips Shares Fall;"* (ii) October 6, 2008 press release; (iii) October 9, 2008, in an interview with Barry Parker of BDP1 Consulting, entitled *"George Economou, Chairman and CEO of Dryships, Sets the Record Straight;* (iv) October 27, 2009, Third Quarter Earnings Conference Call; (v) March 25, 2010 article by Scott Eden, entitled *"DryShips COO Talks Drillships IPO*; (vi) January 29, 2010, in an interview with Jennifer Schonberger; (vii) prospectus supplements filed with the SEC on May 7, 2009, November 19, 2009 and April 21, 2010. These statements were materially false

and misleading because, among other things, they misrepresented DryShips ability to comply with its loan covenants, they failed to disclose that DryShips intends to raise equity and that DryShips lacks charters and/or financing necessary for spin-off to take place, and furthermore, they misrepresented the timeframe for the spin-off and/or IPO. They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening facts.

153.    As described above, these Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them. Specifically, these Defendants knew or should have known, inter alia, that the financial condition of DryShips was deteriorating throughout 2008 and that DryShips will be unable to comply with its loan covenants; that a decision to come out with a spin-off and/or IPO had been reached without adequate due diligence and that DryShips will not be able to secure loans and charters necessary to complete the spin-off or come out with an IPO in the fourth quarter of 2008 or first quarter of 2009; that DryShips may be unable to come out with an IPO in 2009 or 2010; that DryShips shareholders will not receive shares of the new entity; that the spin-off and/or IPO will not have a positive effect on DryShips shareholders; and that DryShips will continue to raise equity.

154.    These Defendants engaged in this scheme in order to alleviate financial burden on Economou's privately held corporations, maintain and/or inflate the prices of DryShips common stock and induce DryShips shareholders to hold and/or purchase additional DryShips stock.

155.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchased of DryShips securities during the Class Period. Plaintiff and the Class would not have purchased and/or

otherwise required DryShips common stock at the prices they paid, or at all, or would have continued to hold the stock if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements and/or omissions of material facts.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### (Against Defendants Economou, Khanna, and the DryShips Board)

156.   Plaintiff repeat and re-allege each and every allegation contained above as if fully set forth herein.

157.   This Count is asserted against Defendants Economou, Khanna and the DryShips Board for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of members of the Class.

158.   During their tenures as officers and/or directors of DryShips, each of these Defendants was a controlling person of DryShips within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agent, and their ownership and contractual rights, participation in and/or awareness of DryShips' operations and/or intimate knowledge of the false financial statements filed by the company with SEC and disseminated to the investing public. These Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. These Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements to be corrected.

159.   In particular, each individual Defendant had direct and supervisory involvement in the day-to-day operations of the company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

160.   The DryShips Board Defendants participated in DryShips Board meetings and conference calls, reviewed and voted to purchase the drillships from Cardiff, approved all of the decision to raise equity, and consented to the spin-off.

161.   In their capacities as senior corporate officers and/or directors of DryShips, these Defendants were made aware of the circumstances surrounding the purchase of drillships and the spin-off and/or IPO, including the terms of purchase and spin-off. As a result of the foregoing, Economou, Khanna and the DryShips Board Defendants, as a group and individually, were control persons of DryShips within the meaning of Section 20(a) of the Exchange Act.

162.   As set forth above, the First Claim Defendants each violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of DryShips and, as a result of their own aforementioned conduct, Economou, Khanna and the DryShips Board Defendants are liable pursuant to Section 20(a) of the Exchange Act jointly and severally with, and to the same extent as DryShips is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plantiff and other members of the Class who purchased or otherwise acquired DryShips common stock. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of DryShips, each of these Defendants is responsible for the material misstatements and omissions made by DryShips.

163.   As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock.

## XII.   CLAIMS UNDER THE SECURITIES ACT

164.   The claims in Counts III-IV are brought under Sections 11, 12, and 15 of the Securities Act. The Securities Act claims are brought on behalf of persons or entities who purchased DryShips common stock during the Class Period. The Securities Act claims are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of the Defendants – i.e., they do not allege, and do not sound in, fraud – and Lead Plantiff specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

165.   On May 7, 2009 DryShips entered into an ATM Equity Sales Agreement with Merrill and filed a prospectus supplement announcing its intention to raise equity in the Secondary offering through the sale of up to $475 million of DryShips common shares. Merrill acted as underwriter of this Secondary Offering.

166.   The Secondary Offering was conducted pursuant to the Secondary Offering Registration Statement, which incorporated the Prospectus Supplement (defined collectively above as the "Offering Documents"). The Offering Documents contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained herein not misleading with respect to the Primelead (OceanRig) spin-off.

167.   Specifically, the Offering Documents incorporated by reference the DryShips annual report on Form 20-F/A filed on April 3, 2009. Page S-39 of this report provided, "[a] shareholder may recognize taxable income and be subject to tax *as a result of receiving shares of Ocean Rig*

*UW in the spin-off, notwithstanding that cash had not been received."* (emphasis added).

Moreover, page S-70 of the report emphasized possible tax consequences of the spin off,

> [if] we spin off the stock of our subsidiary, Ocean Rig UDW, to our shareholders, depending on the manner in which spin-off is structured, the transaction may be treated as an in kind-distribution with respect to our common stock, and as a result as a taxable dividend to U.S. Holders of our common stock, or otherwise as a transaction resulting in taxable gain for U.S. Holders of our common stick, notwithstanding that cash has not been received.

168.    Furthermore, page 8 of the aforementioned annual report stated *"[we] will spin-off Primelead to our shareholders by means of distribution to our shareholders of one share of Primelead for each of our outstanding common shares, or the Spin Off"* (emphasis added). Then, once again, page 29 provided that the spin off may result is tax liabilities for shareholders, even though "[shareholders] do not receive cash with which to pay such liability.

169.    On November 19, 2009 DryShips offered up to 26.1 million common shares to loan to Deutsche Bank AG, London Branch, an affiliate of Deutsche Bank, the underwriter for this offering.

170.    The offering was conducted pursuant to the Registration Statement, which incorporated the Prospectus Supplement, dated November 19, 2009 (defined collectively above as the "Offering Documents"). The Offering Documents contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained herein not misleading with respect to the Primelead (OceanRig) spin-off.

171.    Specifically, the Prospectus stated, *"we will spin-off Primelead to our shareholders by means of distribution to our shareholders of one share of Primelead for each of our outstanding shares, or the Spin Off"* (emphasis added).

172.    On April 21, 2010, DryShips offered up to 10.0 million of common stock shares to loan to Deutsche Bank AG, London Branch, an affiliate of Deutsche Bank, the underwriter for this offering.

173.    The offering was conducted pursuant to the Registration Statement, which incorporated the Prospectus Supplement, dated April 21, 2010 (defined collectively above as the "Offering Documents"). The Offering Documents contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained herein not misleading with respect to the Primelead (OceanRig) spin-off.

174.    Specifically, page S-14 of the Prospectus Supplement stated,

> [a] spin-off of Ocean Rig UDW may be taxable transaction to our shareholders depending upon their country of residence. A shareholder may recognize taxable gain and be subject to tax as a result of receiving shares of OceanRig UDW in the spin-off.

175.    Furthermore, page 7 of the Prospectus once again promised share of the spin-off entity,

*"we will spin-off Primelead to our shareholders by means of distribution to our shareholders of one share of Primelead for each of our outstanding shares, or the Spin Off"* (emphasis added).

176.    Defendants' statements described at ¶¶ 169-177 were untrue, and omitted material facts because (i) they represented that shareholders of DryShips will receive shares of the spin-off entity; and (ii) they created an impression that DryShips shareholders will receive spin-off shares of substantial value, in one-for-one ratio, when in fact it was not feasible for DryShips to issue any significant amount of spin-off shares to every DryShips shareholder.

177.    Defendants' statements referring to the spin-off entity were highly material because among other reasons (i) they placed emphasis on the value of the spin-off shares by continuously referring to tax consequences; (ii) they created the impression that DryShips shareholders will be receiving a substantial number of share of the spin-off entity;  (iii) they created an impression

that DryShips shareholders will receive a share of the spin-off entity per each share of DryShips common stock, thereby ensuring that DryShips shareholders will hold and continue to acquire DryShips common stock.

## COUNT III

### For Violations of Section 11 of the Securities Act
### (Against DryShips, Economou, Nakhleh, The DryShips Board, and the Underwriter Defendants)

178.   Lead Plantiff repeat and reallege the allegations above at ¶¶ 13-34 and ¶¶ 164-177, as if fully set forth herein. For purposes of this claim, Lead Plantiff expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence and/or strict liability.

179.   This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons who purchased DryShips common stock in the aforementioned offerings against DryShips, Economou, Nakhleh, the DryShips Board, Merril Lynch and Deutshe Bank.

180.   The Registration Statements, described at ¶¶ 167-175 contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above.

181.   DryShips is the issuer of the common stock pursuant to the Registration Statements. As an issuer of the common stock DryShips is strictly liable to the members of the Class who purchased the common stock in the Secondary Stock Offering for the materially untrue statements and omissions alleged herein that appeared in or were omitted from the Registration Statements.

182.   Defendant Economou and the other members of the DryShips Board at the time of filing of false and misleading Prospectus and Prospectus Supplements and were signatories of the Secondary Offering Registration Statements, filed with the SEC on January 28, 2009 and

November 19, 2009, both by virtue of having signed the Secondary Offering Registration Statements at the time they were initially filed and by having signed the aforementioned Prospectus Supplements filed with SEC pursuant to Rule 424(b)(5). Defendant Nakhleh was a signatory of the Secondary Offering Registration Statement and signed DryShips Form 6-K filed with the SEC on April 27, 2010. Furthermore, as stated by DryShips in numerous SEC filings, every DryShips transaction is approved by DryShips' Board. These Defendants named in this Count acted negligently and are therefore liable to the members of the Class who purchased the common stock in the Secondary Offerings.

183.    Merril Lynch and Deutsche Bank were underwriters in the secondary offerings described at ¶¶ 167-175. The Underwriter Defendants acted negligently and are therefore liable to the members of the Class who purchased the common stock in the Secondary Offerings.

184.    Lead Plantiff and other members of the Class purchased the common stock issued pursuant to the Secondary Offering Registration Statements.

185.    Lead Plantiff and other members of the Class purchased DryShips common stock in the Secondary Offerings pursuant to the materially false and misleading Secondary Offering Registration Statements and did not know, or in the exercise of reasonable due diligence could not have known, of the untruths and omissions contained therein.

186.    Lead Plantiff and the other members of the Class who purchased the common stock pursuant to the Secondary Offering Registration Statements suffered substantial damages as a result of the untrue statements and omissions of material facts in the Secondary Offering Registration Statements, as they either bought or still held shares during the Class Period, when DryShips was misleading promising a share of spin-off entity per share of DryShips common stock to its shareholders. Furthermore, while DryShips promised to complete the spin-off first in

2009 and then again in 2010, the spin-off did not take place until October, 2011. When the spin-off was completed, DryShips stated that it *"will distribute 2, 967,359 common share of Ocean Rig UDW [spin-off entity] on a pro rata basis, or 0.007266 common share of Ocean Rig UDW for every one share of common stock of DryShips"* (emphasis added). While DryShips shareholders received only a minuscule number of shares of Ocean Rig UDW, on October 7, 2011, Ocean Rig UDW began trading on NASDAQ under the symbol ORIG. On this first day of trading, the market price of Ocean Rig UDW common stock reached $18.73 per share.

187.     This claim is brought within the applicable statute of limitations.

188.     By reasons of the foregoing, the Defendants named in this count have violated Section 11 of the Securities Act.

## COUNT IV

### For Violations of Section 12(a)(2) of the Securities Act (Against DryShips and the Underwriter Defendants)

189.     Lead Plantiff repeat and reallege the allegations above at ¶¶ 13-34 and ¶¶ 164-188, as if fully set forth herein. For purposes of this claim, Lead Plantiff expressly exclude and disclaim any allegations that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

190.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77*l*(a)(2), on behalf of all members of the Class who purchased DryShips common stock in the Secondary Offerings, against the Company and the Underwriter Defendants.

191.     DryShips was a seller, offeror, and/or solicitor of sales of the common stock offered pursuant to the Secondary Offering Registration Statements, which contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in

light of the circumstances under which they were made, not misleading, as set forth more fully above.

192.   The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the common stock offered pursuant to the Secondary Offering Registration Statements, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements in light of the circumstances under which they were made, not misleading, as set forth more fully above.

193.   Lead Plantiff and other members of the Class purchased DryShips common stock in the Secondary Offerings pursuant to the materially false and misleading Secondary Offering Registration Statements and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

194.   Members of the Class who purchased the common stock pursuant to the Secondary Offering Registration Statements and held the stock have sustained substantial damages as a result of the untrue statements of material facts and omissions in the Secondary Offering Registration Statement. Plantiff and those members of the Class who held or acquired stock in the Secondary Offerings pursuant to the materially false and misleading Secondary Offering Registration Statements are entitled to damages from Defendants in the amount of $18.73 per share of Ocean Rig UDW stock which Defendants promised to distribute in one-for one-ratio to DryShips' shareholders. Lead Plaintiff held a total of 27,000 shares of DryShips, as a result of untrue statements of material facts and omissions in the Secondary Offering Registration Statements. Therefore, Lead Plaintiff is entitled to damages from Defendant, in the amount of $505,710.00, which equals to $18.73 per share for the 27,000 held by Lead Plaintiff.

195.   This claim is brought within the applicable statute of limitations.

196.   By virtue of the foregoing, the Defendants named in this count violated Section 12(a)(2) of the Securities Act.

## COUNT V

### For Violations of Section 15 of the Securities Act
### (Against Defendants Economou, Khanna, Nakhleh, and the DryShips Board)

197.   Lead Plantiff repeat and reallege the allegations above at ¶¶ 13-34 and ¶¶ 164-196 as if fully set forth herein. For purposes of this claim, Lead Plantiff expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

198.   This count is asserted against Defendants Economou, Nakhleh, and the DryShips Board for violations of Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of all members of the Class who purchased the common stock issued pursuant to the Secondary Offering Registration Statements.

199.   At all relevant times, these Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. Defendant Economou, at the time of the filing of the Prospectus Supplements dated January 28, 2009 and November 19, 2009, served as Chief Executive Officer, Chairman of the Board, and was Interim Chief Operating Officer until March, 2009. Defendant Nakhleh, was CFO of DryShips when Prospectus Supplement dated April 21, 2010 was filed. Defendant Khanna was COO of DryShips at the time of November 19, 2009 and April 21, 2010 filings. Defendants Economou and Nakhleh were also signatories of the Secondary Offering Statements.

200.   Defendants Economou, Nakhleh, Khanna and the DryShips Board, prior to and at the time of aforementioned Secondary Offerings, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of

DryShips' business affairs, including the Ocean Rig UDW spin-off. As officers and/or directors of a publically owned company, Economou, Nakhleh, Khanna and the DryShips Board had a duty to disseminate accurate and truthful information with respect to DryShips' business and financial operations, including its spin-off of Ocean Rig UDW. Defendants Economou, Nakhleh, Khanna and the DryShips Board participated in the preparation and dissemination of Offering Documents, including Prospectus and Prospectus Supplements described at ¶¶ 167-175, and otherwise participated in the process necessary to conduct Secondary Offerings. Because of their positions of control and authority as senior officers and/or directors of DryShips, Economou, Nakhleh, Khanna and the DryShips Board were able to and did, control the contents of the Prospectus and Prospectus Supplements and, hence, the Secondary Offering Documents, which contained materially untrue information.

201.    By reason of the aforementioned conduct, Defendants Economou, Nakhleh, Khanna and the DryShips Board are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as DryShips is liable under Sections 11 and 12(a)(2) of the Securities Act, to Lead Plaintiff and members of the Class who purchased the common stock pursuant to the Offering Documents filed with the SEC.

## XIII.   BREACH OF FIDUCIARY DUTY

### COUNT VI

### For Breach of Fiduciary Duty
### (Against Defendants DryShips, Economou, Khanna, Nakhleh, Fotiou and the DryShips Board)

202.    Plaintiff hereby incorporates by reference the allegations above as through fully set forth hereinafter.

203.    These Defendants owed and owe Plantiff and members of the Class, a fiduciary obligations and were required to: (i) use their ability to manage DryShips in a fair, just and equitable manner; (ii) act in furtherance of the best interests of DryShips' shareholders; (iii) govern DryShips in a manner that benefitted the Company and its shareholders; (iv) refrain from abusing their positions of control, power, prestige, and profit; (v) not favor the interests of others at the expense of DryShips' shareholders; (vi) truthfully, promptly, and accurately report on the status of the Company and its operations and finances to the shareholders; and (vii) avoid and prevent corporate waste and unnecessary expense.  By reason of their fiduciary relationships, these Defendants also had an obligation to avoid and prevent corporate waste and unnecessary expense.

204.    These Defendants, with reckless disregard for DryShips Code of Ethics, described at ¶¶ 35-37, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

205.    These Defendants, all of them seasoned veterans of shipping industry and finance, with combined experience of over 120 years, recklessly caused DryShips to engage in the wrongful conduct described herein, or were reckless in failing to prevent DryShips from engaging in such conduct.  Defendants, and each of them, also caused DryShips to enter into transactions without regard to shareholders' best interests.

206.    These Defendants, aided and abetted, encouraged and rendered substantial assistance to each other in accomplishing the wrongful conduct, acts and omissions and wrongful goals complained of herein.  In aiding and abetting and substantially assisting the commission of these wrongful acts, each of the Defendants realized that his conduct would substantially assist the accomplishments of the wrongful conduct, wrongful goals, and wrongdoing.

207.   As a result of these Defendants' wrongful conduct, and the wrongful conduct of each of them, Plantiff and other members of the Class have suffered economic losses during the Class Period.

## COUNT VII

### For Breach of Fiduciary Duty
### (Against Underwriter Defendants)

208.   Plantiff hereby incorporate by reference all of the Paragraphs above as though fully set forth hereinafter.

209.   On January 28, 2009, DryShips announced its intention to raise more than $500.0 million dollars in ATM Equity Sales Agreement with Merrill Lynch. As set forth above, Merrill Lynch acted as underwriters of the offering.

210.   From September of 2010 through December 2010, DryShips conducted secondary offerings and offered and sold 74,818,706 of shares of common stock, and raised $342.3 million in equity. As set forth above Deutsche Bank acted as the underwriter for these secondary offerings.

211.   These Defendants had a fiduciary duty to DryShips' shareholders to issue an accurate target price for the new common shares of DryShips, taking under consideration market conditions as well as prior share offerings, to avoid and disclose any conflicts of interest that may cause them to overprice the shares, and to conduct reasonable inquiry prior to underwriting new shares.

212.   Defendant Deutsche Bank had an incentive to overprice newly issued common shares of DryShips because Deutsche Bank was a note holder of a $1.2 billion loan to DryShips. On December 3, 2009, when DryShips stock value was fluctuating between $3.00 and $6.00 per share, Detsche Bank had increased the target price of DryShips common stock to $11.00. Then,

shortly after the Secondary Offering which took place on November 19, 2009, on January 25, 2010 Deutsche Bank again set an inflated target price of $10.0 per share of DryShips common stock.

213.   Defendants Deutsche Bank and Merrill failed to conduct a reasonable inquiry prior to underwriting new shares of DryShips, thereby breaching their fiduciary duty to DryShips' shareholders.  These Defendants had knowledge and/or recklessly disregarded that DryShips had issued numerous materially false and misleading statements regarding the financial health of DryShips, as well as its plans to come out with a drillships spin-off, and more specifically its ability to issue a common share of Ocean Rig UDW per every share of DryShips common stock held by DryShips shareholders. Furthermore, Defendants had knowledge that Dryship had previously raised equity by means of numerous share offerings, and that these additional offerings of common stocks have substantially diluted the DryShips stock, causing the value of common to stock decrease considerably.

214.   By engaging in the aforementioned acts, these Defendants, aided and abetted, encouraged and rendered substantial assistance to DryShips in accomplishing the wrongful conduct, acts and omissions and wrongful goals complained of herein.  In aiding and abetting and substantially assisting the commission of these wrongful acts, each of the Defendants realized that his conduct would substantially assist the accomplishments of the wrongful conduct, wrongful goals, and wrongdoing.

215.   As a result of these Defendants' wrongful conduct, and the wrongful conduct of each of them, Plantiff and other members of the Class have suffered economic losses during the Class Period.

**PRAYER FOR RELIEF**

63

WHEREFORE, Plantiff, on behalf of themselves and all other class members, pray for judgments as follows:

A.  A determination that this action is proper class action and a certification of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.  An award of compensatory damages and damages pled in Count V of this Amended Complaint in favor of Lead Plaintiff and other Class members against all defendants for damages sustained as a result of defendants' wrongdoing, and interest thereon;

C.  An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, and other disbursements; and

D.  A grant of such relief as the Court may deem just and proper.


## JURY TRIAL DEMANDED

Plantiff hereby demand a jury trial.




Respectfully Submitted,

LUTOVICH LAW, LLC

By: _____

Julia M. Lutovich, #MO61798
Attorney for Plaintiff
8151 Clayton Rd, Suite 200
Clayton, MO 63117
(314) 898-3054 Telephone
(314) 880-7755 Facsimile
julia.lutovich@lutovichlaw.com

## PLANTIFF' CERTIFICATE

The undersigned ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.     Plantiff have reviewed the complaint against DryShips and certain other defendants.

2.     Plantiff did not acquire the security that is the subject of this action at the direction of Plantiff' counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plantiff are willing to serve as a representative party on behalf of a class, including providing testimony at depositions and trial, if necessary.

4.     Plantiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plantiff' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5.     Plantiff held common shares of DryShips from  December, 2008, to December 2010.

6.     During the three years prior to the date of this Certification, Plantiff have not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

7.     We declare under penalty of perjury that the information above is accurate.  Executed this 24th day of January, 2012.

Shamim Rabbani

Shamim Rabbani

65