UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SHAMIM RABBANI, RICHARD S. BEST, and JASON H JENNINGS individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV130 RWS |
| | ) | |
| DRYSHIPS INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This lawsuit brings class-wide securities claims against DryShips, Inc.,

several of its senior managers, and its underwriter on behalf of persons who

purchased or acquired the common stock of DryShips between December 1, 2008,

and August 4, 2011. Lead plaintiffs, Shamim Rabbani, Richard Best, and Jason

Jennings, claim that the defendants[1] violated Sections  10(b) and 20(a) of the

Securities Exchange Act of 1934[2] and Rule 10b-5[3] by knowingly or recklessly

making false and misleading statements or omissions about a planned spin-off of a

---

[1]The underwriter, Merrill Lynch & Co., Inc. ("Merrill Lynch"), is not listed as a defendant on these counts.

[2]15 U.S.C. §§ 78j(b) and 78n(a).

[3]17 C.F.R. § 240.10b-5.

DryShips subsidiary, the ability of DryShips to comply with existing loan covenants, and DryShips's general financial condition. This lawsuit also includes a subclass of plaintiffs who purchased DryShips's common stock pursuant to or traceable to the Company's May 2009 and September 2010 Offerings. The subclass alleges the defendants violated Sections 11, 12, and 15 of the Securities Act of 1933[4] by making false or misleading statements and omissions in connection with the May 2009 and September 2010 securities offerings. Defendants move to dismiss the amended complaint[5] on the ground that the challenged statements are not actionable, are protected by the bespeaks caution doctrine, or fall within the safe harbor provision of the Private Securities Litigation Reform Act ("PSLRA").[6] Defendants also contend that the plaintiffs fail to meet the heightened pleading standard required by the PSLRA. Defendants finally allege plaintiff Shamim Rabbani lacks constitutional standing to challenge statements regarding DryShips's spin-off under the Securities Act. After a thorough review of the record, I find that dismissal is required as plaintiffs has not

---

[4]15 U.S.C. §§ 77k, 77l and 77o.

[5]Although this is the first amended complaint before me on this caption and case number, a similar complaint was previously filed in this Court and voluntarily dismissed. No. 4:11-CV-2056-RWS. Prior to dismissal, that complaint was amended twice.

[6]15 U.S.C. § 78u-4.

stated a claim for securities fraud against the defendants.

## *Background*

DryShips is a corporation based in Athens, Greece and incorporated in the Marshall Islands. It owns a global shipping fleet of drybulk carriers and tankers. Through its subsidiary, Ocean Rig UDW Inc. ("Ocean Rig"), formerly known as "Primelead," DryShips owns and operates several offshore ultra deepwater drilling units. The individual defendants named in this case are present and former officers of DryShips.[7] Merrill Lynch served as underwriter and sales agent for a securities offering conducted by DryShips in May 2009.

In July and October 2008, DryShips agreed to purchase a number of new ships to add to its fleet. In October 2008, as the global economy began to deteriorate, George Economou, CEO of DryShips, stated that the company was not in danger of breaching its loan covenants. Throughout the world-wide economic decline of 2008, the global demand for shipping declined dramatically. DryShips

---

[7]Defendant George Economou ("Economou") is President and Chief Executive Officer of DryShips. Defendant Pankaj Khanna ("Khanna") became the Chief Operating Officer of DryShips in March 2009 and is a director of Ocean Rig. Defendant Ziad Nakleh has served as the Chief Financial Officer of Dryships since November 2009. Since January 2010, Defendant Niki Fotiou has served as the Senior Vice President—Head of Accounting and Reporting of Dryships. The remaining individual defendants serve on the DryShips board of directors: George Demathas has served since July 2006; George Xiridakis since May 2006; Evangelos Mytilinaios since December 19, 2008; Harry Kerames since July 29, 2009; Vasselis Karamitsanis since July 29, 2009; and Chryssoula Kandylidis since March 5, 2008.

announced in December 2008 and January 2009 that it was cancelling its vessel acquisition plans. In January 2009, DryShips also announced that it was in breach of loan covenants with two of its lenders.

In 2008, DryShips revealed that it was acquiring two drillships used in ultra deep water drilling and that it planned to spin off its deepwater drilling segment to shareholders in late 2008 or early 2009. Between 2008 and 2011, DryShips and its officers made numerous statements related to the timing and form of the intended spin off. Ultimately, DryShips spun off a portion of that business to its shareholders by giving a fraction of a share for each share held in DryShips.

Plaintiffs allege that because of false or misleading statements issued by defendants, the DryShips share price was artificially inflated. Plaintiffs further allege that the stock price dropped in response to later truthful statements by DryShips as to the actual state of the company. Specifically, Plaintiffs allege that when DryShips announced that it would only spin off 2% of its interest in its drillships subsidiary, the price of DryShips common stock fell from $3.13 per share to $2.89 per share.

### Legal Standards

Before discussing the standards that govern defendants' motions to dismiss, I will briefly set out what Plaintiffs must plead and prove to prevail on their

claims.

*Exchange Act Claims*

Plaintiffs bring claims under Section 10(b) of the Securities Exchange Act,

Rule 10b–5 implementing that section of the Act, and Section 20(a) of the

Exchange Act.  Section 10(b) and Rule 10b-5 prohibit fraudulent conduct in the

sale and purchase of securities.  Section 10(b) makes it unlawful "[t]o use or

employ, in connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors." 15 U.S.C. § 78j(b).  "Rule 10b–5

implements [Section 10(b)] by making it unlawful to, among other things, 'make

any untrue statement of a material fact or to omit to state a material fact necessary

in order to make the statements made, in the light of the circumstances under

which they were made, not misleading.'"  Minneapolis Firefighters' Relief Ass'n

v. MEMC Elec. Materials, Inc., 641 F.3d 1023, 1028 (8th Cir. 2011) (quoting

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011)).  As the

Eighth Circuit Court of Appeals explained:

> To prevail, a § 10(b)/Rule 10b–5 claimant ordinarily must show (1) a
> material misrepresentation or omission by the defendant; (2) scienter;
> (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

MEMC Elec. Materials, Inc., 641 F.3d at 1028 (citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)).

"In order to satisfy the [PSLRA]'s falsity pleading standard, a complaint may not rest on mere allegations that fraud has occurred." In re Cerner Corp. Sec. Litig., 425 F.3d 1079, 1083 (8th Cir. 2005). "Instead, the complaint must indicate why the alleged misstatements would have been false or misleading at the several points in time in which it is alleged they were made. In other words, the complaint's facts must necessarily show that the defendants' statements were misleading." Id. (internal citations and quotation marks omitted). "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Detroit Gen. Ret. Sys. v. Medtronic, Inc., 621 F.3d 800, 805 (8th Cir. 2010) (internal citation and quotation marks omitted).

Scienter "can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." Id. at 808 (internal citation and quotation marks omitted). "The inquiry

. . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322–23 (2007). "[I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." Id. at 323. The Supreme Court explained:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." Recall in this regard that § 21D(b)'s pleading requirements are but one constraint among many the PSLRA installed to screen out frivolous suits, while allowing meritorious actions to move forward. Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Id. at 323–24.

Section 20(a) of the Securities Exchange Act provides for a companion claim, establishing "liability of those who, subject to certain defenses, 'directly or

indirectly' control a primary violator of the federal securities laws." <u>Lustgraaf v. Behrens</u>, 619 F.3d 867, 873 (8th Cir. 2010) (quoting 15 U.S.C. § 78t(a)).  Section 20(a) has been interpreted "as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable."  <u>Id.</u> at 873 (internal citation and quotation marks omitted).[8]  "The plain language of the control-person statute dictates that, absent a primary violation, a claim for control-person liability must fail."  <u>Id.</u> at 874.

*Securities Act Claims*

Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions. Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications. 15 U.S.C. §§ 77k(a), 77l(a)(2).  Section

---

[8]To meet this standard, a plaintiff must prove:

(1) that a primary violator violated the federal securities laws; (2) that the alleged control person actually exercised control over the general operations of the primary violator; and (3) that the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated.

<u>Lustgraaf</u>, 619 F.3d at 873 (internal citation and quotation marks omitted).  "Culpable participation by the alleged control person in the primary violation is not part of a plaintiff's prima facie case."  <u>Id.</u> at 873–74.  If plaintiff satisfies the prima facie burden, the burden shifts to defendants to show that they "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  <u>Id.</u> at 874 (quoting 15 U.S.C. § 78t(a)).

15, in turn, creates liability for individuals or entities that "control[ ] any person liable" under section 11 or 12. Id. § 77o. Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12.

Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC. See 15 U.S.C. § 77k(a). In the event of such a misdeed, the statute provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties. Id.

To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Id.

*Safe-Harbor Provision*s

Both the Exchange Act and the Securities Act  provide a safe harbor for a forward-looking statement that is "identified as a forward-looking statement, and

is accompanied by meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the

forward-looking statement," and also for a forward-looking statement that is

"immaterial." 15 U.S.C. § 77z-2(c)(1)(A); 15 U.S.C. § 78u–5(c)(1)(A).  The safe

harbor further exempts from liability forward-looking cautionary statements where

the plaintiff fails to prove that the statement was made with actual knowledge that

the statement was false or misleading (either by a natural person or, if by a

business entity, by or with approval of an executive officer). 15 U.S.C. § 77z-

2(c)(1)(B); 15 U.S.C. § 78u–5(c)(1)(B).

   The safe harbor defines six exclusive categories of forward-looking

statements:

> (A) a statement containing a projection of revenues, income (including
> income loss), earnings (including earnings loss) per share, capital
> expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future
> operations, including plans or objectives relating to the products or
> services of the issuer;
>
> (C) a statement of future economic performance, including any such
> statement contained in a discussion and analysis of financial condition
> by the management or in the results of operations included pursuant to
> the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any
> statement described in subparagraph (A), (B), or (C).

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 77z-2(i)(1); 15 U.S.C. § 78u–5(i)(1).

"Courts applying this safe harbor have made clear that it only protects purely forward-looking statements—i.e., not those that also contain representations as to present or historical facts."  W. Wash. Laborers-Employers Pension Trust v. Panera Bread Co., 697 F. Supp. 2d 1081, 1092–93 (E.D. Mo. 2010); In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 213 (1st Cir. 2005) ("The safe harbor ... is intended to apply only to allegations of falsehood as to the forward-looking aspects of the statement.").  To decide whether a statement is truly forward-looking, "the determinative factor is not the tense of the statement; instead, the key is whether its 'truth or falsity is discernible only after it is made.'" Panera Bread, 697 F. Supp. 2d at 1093 (quoting Harris v. Ivax Corp., 182 F.3d 799, 805 (11th Cir. 1999)).  The applicability of this safe harbor is a question of law.  See 15 U.S.C. § 78u–5(e) ("On any motion to dismiss based upon [the safe harbor], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not

11

subject to material dispute . . . ."); Panera Bread, 697 F. Supp. 2d at 1093.  "[A] forward-looking statement is protected if it is immaterial or identified as forward-looking and accompanied by meaningful cautionary language, regardless of whether the speaker knows the statement is false." Id. at 1089.

The respective safe harbor provisions require courts to assess whether cautionary language accompanying a forward-looking statement is sufficiently meaningful.  See 15 U.S.C. § 78u–5(c)(1)(A)(i) (safe harbor requires "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"); 15 U.S.C. § 77z-2(c)(1)(A)(i) (same).  The cautionary language need not be a part of the forward-looking statement so long as the statement specifies where it can be located.  See 15 U.S.C. § 78u–5(c)(2) (oral statements); Panera Bread, 697 F. Supp. 2d at 1089–1090 (courts uniformly conclude that incorporation by reference for written forward-looking statements is permissible); Yellen v. Hake, 437 F. Supp. 2d 941, 963–64 (S.D. Iowa 2006) (same and collecting cases).

Although courts have articulated the standard underlying the meaningfulness requirement differently, it requires more than mere boilerplate but less than disclosure of every potential risk.  See, e.g., Panera Bread, 697 F. Supp. 2d at 1090; Asher v. Baxter Int'l Inc., 377 F.3d 727, 732–33 (7th Cir. 2004)

12

(applying section 78u–5(c)(1)(A) and identically-worded section 77z–2(c)(1)(A)

safe harbors and concluding that the cautionary language requirement cannot

require disclosure of all potential risks); Southland Sec. Corp. v. INSpire Ins.

Solutions, Inc., 365 F.3d 353, 372 (5th Cir. 2004) ("The requirement for

'meaningful' cautions calls for 'substantive' company-specific warnings based on

a realistic description of the risks applicable to the particular circumstances, not

merely a boilerplate litany of generally applicable risk factors."); Harris, 182 F.3d

at 807 (to be meaningful, cautionary statements must warn of "risks of a

significance similar to that actually realized . . . ."). "[T]o determine whether

cautionary language is adequate, courts should evaluate it in light of the allegedly

undisclosed risk and determine if a reasonable investor would have concluded that

the risk that eventually materialized never existed."  Panera Bread, 697 F. Supp.

2d at 1090 (citing In re Sierra Wireless, Inc. Sec. Litig., 482 F. Supp. 2d 365, 380

(S.D.N.Y. 2007)).

### *Standards Governing Motion to Dismiss*

Defendants move to dismiss these claims under Rules 12(b)(6) and 9(b) of

the Federal Rules of Civil Procedure and the PSLRA. To survive a motion to

dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain

factual allegations sufficient "'to raise a right to relief above the speculative

13

level.'" Parkhurst v. Tabor, 569 F.3d 861, 865 (8th Cir. 2009) (quoting Bell Atl.

Twombly, 550 U.S. 544, 555 (2007)).  Stated another way, "the complaint must

allege only enough facts to state a claim to relief that is plausible on its face." B &

B Hardware, Inc. v. Hargis Indus., Inc., 569 F.3d 383, 387 (8th Cir. 2009) (internal

quotation marks and citation omitted).  "The plausibility of a complaint turns on

whether the facts alleged allow us to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Lustgraaf, 619 F.3d at 873

(internal citation and quotation marks omitted).  The court must still "accept as

true the plaintiff's well pleaded allegations," Parkhurst, 569 F.3d at 865, and

"construe the complaint liberally in the light most favorable to the plaintiff."

Eckert v. Titan Tire Corp., 514 F.3d 801, 806 (8th Cir. 2008).

***Analysis***

**1.**    ***Exchange Act Claims***

Although Rule 8(a) of the Federal Rules of Civil Procedure ordinarily

requires only a "short and plain statement" of the claims,  Rule 9(b) and the

PSLRA apply to Plaintiffs' Exchange Act claims.  "Under Rule 9(b)'s heightened

pleading standard, allegations of fraud, including fraudulent concealment for

tolling purposes, [must] be pleaded with particularity." Summerhill v. Terminix,

Inc., 637 F.3d 877, 880 (8th Cir. 2011) (internal citation and quotation marks

14

omitted).  "In other words, Rule 9(b) requires plaintiffs to plead the who, what,

when, where, and how: the first paragraph of any newspaper story."  Id.  As the

United States Court of Appeals for the Eighth Circuit has explained, "The PSLRA

goes beyond the ordinary pleading requirements described in Rules 8(a)(2) and

9(b) of the Federal Rules of Civil Procedure . . . ."  In re 2007 Novastar Fin. Inc.,

Sec. Litig., 579 F.3d 878, 882 (8th Cir. 2009).  "Claims governed by the PSLRA

must specify each statement alleged to have been misleading, the reason or reasons

why the statement is misleading (the falsity requirement), and state with

particularity facts giving rise to a strong inference that the defendant acted with

the required state of mind (the scienter requirement)."   Lustgraaf v. Behrens, 619

F.3d 867, 873 (8th Cir. 2010) (internal citations and quotation marks omitted); see

also Detroit Gen. Ret. Sys. v. Medtronic, Inc., 621 F.3d 800, 805 (8th Cir. 2010).

*Loan Covenants*

Plaintiffs first challenge statements made by Economou in a November 7,

2008, article titled "Economou Allays Fears as DryShips Shares Fall." Economou

stated, "We are not breaching any covenants and we are not at risk of breaching

covenants. Nor are we planning on breaching them." Economou further asserted

that DryShips is in "strong financial condition." The article stated that DryShips

had cash assets of $456 million and another $1.2 billion in committed bank lines.

15

On January 29, 2009, DryShips announced that it was in breach of two loan covenants. Plaintiffs allege that Economou and the other DryShips defendants knew that the November 7, 2008, statements were false when made. Defendants contend that the plaintiffs have not pled facts demonstrating that defendants had access to, or knowledge of, information contradicting Economou's statements when made.

Plaintiffs assert that Economou knew or disregarded that the loan covenant statements were false, based on several facts. First, on July 3 and October 6, 2008, DryShips had agreed to purchase several ships, which increased the company's debt. Second, during October 2008, the Baltic Dry Index, a leading indicator of future economic growth and contraction in the shipping industry, had fallen 70%. Finally, plaintiffs point to contractual penalties for cancelling the ship purchase agreements and assert that defendants knew that those penalties would put the Company at risk for loan default.

The PSLRA's falsity pleading requires particularity and cannot be satisfied by alleging that defendants made statements "and then showing in hindsight that the statement is false." Elam v. Neidorff, 544 F.3d 921, 927 (8th Cir. 2008) (citing In re Navarre Corp. Sec. Litig., 299 F.3d 735, 743 (8th Cir. 2002)). The PSLRA requires that the complaint's facts "necessarily show that the defendants'

16

statements were misleading." In re Hutchinson Tech. Inc. Sec. Litig., 536 F.3d 952, 958–59 (8th Cir. 2008).  Plaintiffs fail to show how the Company's debt as of November 7, 2008, placed DryShips in danger of default on its loan covenants. Plaintiffs likewise do not show how penalties for contractual breach affected the Company's ability to comply with its loan covenants. Finally, Plaintiffs do not assert any facts showing that Economou could possibly predict the depth or length of the economic recession. "Corporate officials need not be clairvoyant . . . ." Navarre, 299 F.3d at 743.  Plaintiffs provide no facts contemporaneous to the statement by Economou but, rather, attempt to show falsity through hindsight. Plaintiffs fail to plead this point with particularity.

Plaintiffs likewise fail to state a claim as to Economou's November 7, 2008, statement that DryShips is in "strong financial condition." This is quintessential puffery. See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) (citing cases finding statements claiming company "would not 'compromise its financial integrity,'" was "recession-resistant," and had "business strategies [that] would lead to continued prosperity" to be puffery). Puffing statements are immaterial under the PSLRA, because they are "so vague and such obvious hyperbole that no reasonable investor would rely upon them." Id.

Plaintiffs finally allege that the statement of the Company's cash assets and

bank lines was false or misleading in context with its risk of breaching covenants. However, as plaintiffs plead no facts to support this allegation, they fail to state a claim.

*Purchase Agreements*

Plaintiffs next claim as false or misleading the Company's announcements of ship purchase agreements on July 3 and October 6, 2008. Specifically, plaintiffs allege that DryShips failed to disclose that the Company "lacked the resources to purchase four Panamax vessels and nine dry-bulk ships." Plaintiffs also allege that a statement made in conjunction with those purchases—that the terms were "comparable to those that may be obtained from an independent third party"—was materially false and misleading.

Plaintiffs reason that because DryShips cancelled these orders it could not afford them at the outset. This is proof by hindsight and is insufficient to plead a claim under the PSLRA. Elam, 544 F.3d at 921. Plaintiffs also point to what they allege are breach-of-contract terms favorable to the selling entities but fail to show how such terms demonstrate that DryShips lacked sufficient resources to purchase the ships. Plaintiffs likewise fail to show that a third party would offer or agree to different terms. To state a claim under PSLRA, a plaintiff must provide particularized facts showing why the statement was false at the time made. In re

Cerner Corp. Sec. Litig., 425 F.3d 1079, 1083 (8th Cir. 2005). Plaintiffs do not state a claim as to the purchase agreements.

*Spin-Off of Primelead/Ocean Rig*

In a press release dated October 6, 2008, DryShips announced it was entering the offshore drilling industry. Economou stated, "We believe we are entering an industry that has very solid prospects for the next three to five years and we aim to take advantage of this." Economou also commented on a planned spin-off of DryShips subsidiary Primelead (later renamed Ocean Rig):

> We continue to execute on our previously stated business plan to spin off Primelead Shareholders, Inc. (to be renamed) to its shareholders in the form of a share dividend. Our plans remain intact and on schedule. *We expect to file the necessary documents with the SEC within the next few weeks and to complete the spin off either during the 4th quarter of 2008 or the 1st quarter of 2009 subject to SEC review.* (emphasis added).

DryShips's accompanying Form 6-K Report contains the following warnings of some "[i]mportant factors that, on our view, could cause actual results to differ materially from those discussed in the forward-looking statements" of the release, including:

> the strength of world economies and currencies, general market conditions, including changes in charterhire rates and vessel values, changes in demand that may affect attitudes of time charters to scheduled and unscheduled drydocking, changes in DryShips Inc.'s operating

expenses, including bunker prices, dry-docking and insurance costs, or
actions taken by regulatory authorities, potential liability from pending
or future litigation, domestic and international political conditions,
potential disruption of shipping routs due to accidents and political
events or acts by terrorists.

In an October 9, 2008, interview with Barry Parke of BDP1 Consulting,

Economou  responded to the question, "How will the [Primelead] spin-off take

place?" by stating:

> *This is a really simple process which is only subject to SEC approval
> and not to the broader state of the markets.* After we file all appropriate
> documents with the SEC, and once approved, we will spin-off the entity
> to our shareholders as a dividend. *We hope to do so in the fourth quarter
> of 2008 or in the first quarter of 2009. This is not an IPO, as we will not
> raise any new equity. Simply, each shareholder in DryShips as of the
> record date will end up owning a share in DryShips and a share in the
> new spun-off entity,* which they can then keep or sell on a U.S. stock
> exchange, and the market will then determine the ultimate value of those
> shares. (emphasis added).

Plaintiffs assert the italicized portions of the statements were false or

misleading because 1) the Company had not yet secured charters and financing to

cover the shipyard payments for the ultra-deep-water drillships obtained by

Primelead, which was necessary to complete the spin-off process; 2) the Company

failed to disclose that it was considering an IPO in connection with the spin-off;

and 3) the Company did not spin off Primelead/Ocean Rig until 2011 and that

spin-off resulted in shareholders receiving fewer than one share of per DryShips

share held.

Economou's statement that "we are entering an industry that has very solid prospects for the next three to five years and we aim to take advantage of this" is puffery and, therefore, inactionable. See In re Hutchinson Techs., Inc. Sec. Litig., 536 F.3d 952, 960 (8th Cir. 2008) (finding immaterial statement that "we are well-positioned on a number of new disk drive programs"); see also Rochester Laborers Pension Fund v. Monsanto Co., --- F. Supp. 2d ---, No. 4:10CV1380CDP, 2012 WL 3143914, at *12 (E.D. Mo. Aug. 1, 2012) (finding "solid growth" to be puffery). Such statements are immaterial under the Exchange Act as a matter of law. In re Hutchinson Techs, 536 F.3d at 961.

Plaintiffs allege that defendants had a duty to disclose the need for financing, so that Economou's statement as to the form of the spin-off would not be materially false or misleading. The Supreme Court in Matrixx wrote:

> [I]t bears emphasis that § 10(b) and Rule 10(b)-5 do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading.  Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321–22 (2011) (internal

quotation marks and citations omitted); see also Basic Inc. v. Levinson, 485 U.S.

224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under

Rule 10b-5.").  "A fact is material if it is substantially likely that the disclosure of

the omitted fact would have been viewed by the reasonable investor as having

significantly altered the total mix of information made available." In re K-Tel

International, Inc. Sec. Litig., 300 F.3d 881, 897 (8th Cir. 2002) (quoting

Levinson, 485 U.S. at 231–32).  "Materiality alone is not sufficient to place a

company under a duty of disclosure . . . the law requires an actor to provide

complete and non-misleading information with respect to the subjects on which he

undertakes to speak." K-tel, 300 F.3d at 898 (internal quotation marks and

citations omitted).

Here, plaintiffs fall far short of demonstrating that disclosure of these

additional facts was somehow required. Economou was clearly responding to the

question posed: "What form will the spin-off take?" Economou responded that the

spin-off would not take the form of an initial public offering, which by its nature,

is "subject . . . to the broader state of the markets." Rather, the spin-off, "subject to

SEC approval," would result in each DryShips shareholder owning a share of the

spun-off entity. See 14 U.S. Securities Law for Financial Transactions § 2:163 (2d

ed. 2011) ("In a spinoff, the shares are usually distributed on a *pro rata* basis and

the subsidiary becomes a separate company."); see also id. (listing conditions under which spin-off would not need SEC approval). Plaintiffs' position seems to be that, having disclosed the intended spin-off's form, defendants were obligated to disclose all steps necessary to complete the endeavor. Securities laws impose no such duty; such a requirement would undoubtedly drown the reasonable investor in a never-ending, and ultimately meaningless, deluge of information. When defendants' statements are viewed as a whole, it is clear that no disclosure of additional facts is necessary to render them non-misleading under Matrixx.

Plaintiffs next argue that Economou's statement, "This is not an IPO, as we will not raise any new equity" is a misleading statement of verifiable fact. However, plaintiffs provide no evidence that it is either false or misleading. The complaint states that the Company's partial divestment of Primelead/Ocean Rig ultimately took the form of a spin-off and not an IPO.

The remaining statements by Economou are clearly forward-looking statements as defined by the Exchange Act: "We expect to file the necessary documents with the SEC within the next few weeks and to complete the spin off either during the 4th quarter of 2008 or the 1st quarter of 2009 subject to SEC review." "We hope to [spin off Primelead] in the fourth quarter of 2008 or in the first quarter of 2009." "Simply, each shareholder in DryShips as of the record date

will end up owning a share in DryShips and a share in the new spun-off entity."
Plaintiffs argue that these statements indicate a present determination by the
Company and, thus, are not forward-looking statements. However, all forward-
looking statements implicitly reflect current decisions. To accept the proffered
interpretation would eviscerate the statutory safe harbor.  These are all forward-
looking statements under the categories of plans and objectives of management for
future operations or projections of future dividends, capital structure, or other
financial items. This is true regardless of the tense of some statements, because
they do not make any "specific, verifiable representation about the specific state of
affairs."  W. Wash. Laborers-Employers Pension Trust v. Panera Bread Co., 697
F. Supp. 2d 1081, 1094 (E.D. Mo. 2010).

Under the safe harbor, a forward-looking statement is protected if the
plaintiff fails to prove that the forward-looking statement was made with *actual
knowledge* of its falsity.  15 U.S.C.§ 78u–5(c)(1)(B). To do so, the plaintiffs must
"state with particularity both the facts constituting the alleged violation, and the
facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or
defraud.' " Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007)
(quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)). Under
this heightened pleading standard, a plaintiff must plead facts to support a strong

inference of scienter, 15 U.S.C. § 78u–4(b)(2), that is, the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314.

The question is whether a reasonable person would, based on the facts alleged, find an inference that Economou (1) did not genuinely believe the October 6 statement, (2) actually knew that he had no reasonable basis for making the statement, or (3) was aware of undisclosed facts tending to seriously undermine the accuracy of the statement. This inference must be "cogent and at least as compelling as any opposing inference." Tellabs, 551 U.S. at 323.

In support of their argument that no reasonable basis existed for Economou's statements regarding the spin-off timing, plaintiffs cite the October 6, 2008, press release, which indicated that DryShips's competitors were 'constrained by difficult credit environment." Plaintiffs also point to a November 5, 2008, SEC filing by DryShips that listed risks to investors, including share dilution and the possibility that operating and capital needs might not be satisfied, even given the equity raised by 25 million new shares. Plaintiffs note the falling stock market price of DryShips stock in October 2008 as a motivating factor for issuing misleading statements. Finally, plaintiffs allege that Economou was

25

motivated by his control of Cardiff,[9] the company which contractually managed DryShips fleet. Plaintiffs state that DryShips purchased nine ships "from entities controlled by clients of Cardiff, including Defendant Economou." Plaintiffs allege that by entering this agreement, Economou transferred liability from Cardiff to DryShips and its shareholders.

Plaintiffs' complaint fails to plead actual knowledge with the particularity necessary to satisfy the PSLRA's heightened requirements. Plaintiffs fail to show how the deal structured between third-party clients of Cardiff transfered liability from Cardiff to DryShips. Plaintiffs allege no particularized facts as to Economou's control of any company with which DryShips contracted to purchase a ship. Moreover, plaintiffs do not connect the Primelead/Ocean Rig spin-off with the purchase agreements. On October 6, 2008, Economou's press release projected that the spinoff would be completed in either the fourth quarter of 2008 or the first quarter of 2009. Major economic declines in October and November of that year provide little, if any, support to show that Economou knew on October 6 that the spin-off would be delayed. One simply cannot use hindsight in this manner.

––––––––––––––––––

[9]Plaintiffs allege that Cardiff was seventy percent owned by "the Entrepreneurial Spirit Foundation, a family foundation of Vaduz Liechtenstein, which is controlled by Defendant Economou." Plaintiffs further allege that a company owned by Economou's sister retains the remaining thirty percent of Cardiff.

Moreover, plaintiffs rely upon Economou's statement that DryShips's competitors face constrained credit to infer that DryShips itself would be wholly unable to receive credit. Such layers of inferences fail to reach the normal pleading standard, let alone the heightened standard set forth in the PSLRA. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949–50 (2009).

The inference of scienter arising from plaintiffs' pleadings is far from compelling. I think that a much more likely inference exists: Economou, like many in 2008, could not know how bad the recession would be and made an overly optimistic forecast. Regardless, plaintiffs have not pleaded that Economou had actual knowledge that any of the allegedly misleading statements were false at the time made.  As a result, plaintiffs fail to state a claim as to these statements.

*2009 Supplemental Prospectus Statements*

On November 23, 2009, DryShips filed with the SEC a prospectus supplement to a prospectus filed on October 17, 2008; the November supplement included the full text of the original prospectus as an attachment. The October 17, 2008, prospectus stated:

> Our board of directors has determined that, following the closing of the DrillShips Holdings Transaction and the DrillShips Investment Transaction and the effectiveness of the registration of Primelead's common stock and depending on market conditions, we will spin-off Primelead to our shareholders by means of a distribution to our

shareholders of one share of Primelead for each of our outstanding common shares . . . .

The November 23, 2009, prospectus supplement explicitly states that in the event of inconsistent information, investors should rely upon the supplement, rather than the accompanying prospectus. In place of the spin-off language from the October 17, 2008, prospectus, the supplement provides:

> We are considering selling a minority voting and economic interest in Ocean Rig UDW [formerly Primelead], in a public offering sometime in 2011. Alternatively, we may distribute or spin-off a minority voting and economic interest in Ocean Rig UDW to holders of our voting stock (including holders of our preferred shares) or complete some combination of a public offering and distribution to holders of our voting stock. *There can be no assurance, however, that we will complete any such transaction, which, among other things, will be subject to market conditions.* (emphasis added).

Plaintiffs allege that the October 17, 2008, prospectus as attached to the November 23, 2009, supplement was false because shareholders ultimately received only 0.007266 shares of Primelead/Ocean Rig per share of DryShips. But, rather than promise a one-to-one distribution ratio, the November 23, 2009, supplement states that the Company is considering a wide range of possibilities as to Ocean Rig. Moreover, the supplement explicitly warns that the transaction might not occur at all.  As the November 23, 2009, supplement supersedes by its own terms, no reasonable shareholder would rely on the outdated October 17,

28

2008, prospectus.

*Statements by Mr. Khanna*

During an October 29, 2009, conference call, Khanna stated, "Investing in DryShips is like buying an option on the Ultra Deep Water Drilling. . . . [W]e want to get the maximum valuation for our shareholders so we will do the right thing at that point, whether that is an IPO or just a share spin-off." On March 25, 2010, Khanna stated that DryShips was a "great buy," a "two-for-one deal," and an opportunity for a "free option on [the Primelead] drillships."  When asked about a rumor that DryShips might engage in an IPO for its drillships, Khanna responded that "[o]ur timeline on that is sometime this year." The next day, Khanna stated that "[DryShips] is the only shipping stock that has the potential to double. As soon as we get the charters, we can execute the IPO, [and] we could double in price." Khanna then stated that "I don't have a contract to announce today, but we believe we are still in a good position to have at least one or two of the vessels in the very near term."

Although plaintiffs allege that this is false, plaintiffs fail to provide any particularized facts showing the falsity of these statements at the time they were made. Instead, plaintiffs submit conclusory allegations. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Bell Atl.

Twombly, 550 U.S. 544, 555 (2007). Moreover, all of the statements related to the

quality of DryShips stock and its potential for growth are immaterial puffery. See

Parnes, 122 F.3d at 547. Accordingly, plaintiffs fail to state a claim as to the

statements by Mr. Khanna.

Having concluded that each of plaintiffs' underlying Exchange Act claims

fail, plaintiffs' Section 20(a) control person claims must likewise be dismissed.

See Navarre, 299 F.3d at 748 (finding that an actionable section 20(a) claim must

be preceded by an actionable primary violation under section 10(b)).

**2.     *Securities Act Claims***

Plaintiffs' first set of Securities Act claims relates to an offering

underwritten by Merrill Lynch for the sale of up to $475 million in common shares

dated May 27, 2009. Plaintiffs allege that DryShips filed a prospectus with the

Securities and Exchange Commission ("SEC") on October 17, 2008, which was

incorporated into the offering dated May 27, 2009. This prospectus stated:

> Our board of directors has determined that, following the closing of the
> DrillShips Holdings Transaction and the DrillShips Investment
> Transaction and the effectiveness of the registration of Primelead's
> common stock and *depending on market conditions*, we will spin-off
> Primelead to our shareholders by means of a distribution to our
> shareholders of one share of Primelead for each of our outstanding
> common shares. (emphasis added).

Plaintiffs allege that the Primelead spin-off statement, including later

iterations incorporated by reference,[10] was materially false and misleading, because shareholders ultimately received only 0.007266 common shares of Primelead/Ocean Rig for each share of common stock of DryShips they owned. Defendants argue that this statement is forward-looking and is subject to the judicial "bespeaks caution" doctrine and statutory safe harbor.

"[A] complaint that alleges only immaterial misrepresentations presents an insuperable bar to relief and dismissal of such a complaint is proper." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997) (quotations and citations omitted). "A misrepresentation or omission is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" Id. (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988)). In many circumstances, of course, this presents a factual question for a jury to decide. See, e.g., In re Control Data Corp. Sec. Litig., 933 F.2d 616, 621 (8th Cir. 1991) ("Determination of whether a misrepresentation would have the effect of defrauding the market and inflating the stock price is a jury question. The trier of fact is uniquely competent to determine materiality, as that inquiry requires

---

[10]DryShips issued a Post-Effective Amendment to the Form F-3 Registration Statement on October 20, 2008; this filing repeated the allegedly misleading statement. DryShips also issued a supplement to the October 17, 2008, prospectus on May 7, 2009.

delicate assessments of inferences a reasonable investor would draw from a given set of facts." (quotations and citations omitted)). Where a reasonable investor could not have been swayed by an alleged misrepresentation, however, a court may determine, as a matter of law, that the alleged misrepresentation is immaterial. Parnes, 122 F.3d at 546.

A defendant's alleged misrepresentations or omissions may be immaterial as a matter of law if accompanied by sufficient cautionary statements. Parnes, 122 F.3d at 548.  The "bespeaks caution doctrine," provides that

> when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

Id. (citing In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir.1993)). The cautionary language must relate directly to that by which plaintiffs claim to have been misled. Id. (quotation omitted). See also Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097(1991) ("[N]ot every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."). A dismissal of a securities fraud complaint under

Rule 12(b)(6) should be granted under the bespeaks caution doctrine only where "the documents containing defendants' challenged statements include *enough* cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." Parnes, 122 F.3d at 548.

The Primelead spin-off statement is clearly forward-looking. This statement falls within the statutory category "statement of management's plans for future operations." See 15 U.S.C. § 77z-2(c)(1)(B); 15 U.S.C. § 78u-5(c)(1)(B). To decide whether a statement is forward-looking, "the key is whether its truth or falsity is discernible only after it is made." W. Wash. Laborers-Employers Pension Trust v. Panera Bread Co., 697 F. Supp. 2d 1081, 1093 (E.D. Mo. 2010) (quoting Harris v. Ivax Corp., 182 F.3d 799, 805 (11th Cir. 1999)). The crux of plaintiffs' allegations lies in the failure of future events and not in the representation of a present fact. *Compare* In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 213 (1st Cir. 2005) (finding assertion of current ownership of insurance policy to be present representation), *with* In re Nash Finch Co., 502 F. Supp. 2d 861, 872–73 (D. Minn. 2007) (finding statements of company's current intentions towards future actions to be forward-looking statements).

Defendants point to cautionary language, which they argue renders the Primelead spin-off statement immaterial. The October 17, 2008, prospectus

included the following cautionary statement regarding forward-looking

statements:

> The forward-looking statements in this document are based upon various assumptions, many of which are based, in turn, upon further assumptions, including without limitation, management's examination of historical operating trends, data contained in our records and other data available from third parties. Although DryShips Inc. believes that these assumptions were reasonable when made, because these assumptions are inherently subject to significant uncertainties and contingencies which are difficult or impossible to predict and are beyond our control, DryShips Inc. cannot assure you that it will achieve or accomplish these expectations, beliefs or projections described in the forward looking statements contained in this prospectus.

> Important factors that, in our view, could cause actual results to differ materially from those discussed in the forward-looking statements *include the strength of world economies and currencies, general market conditions, including changes in charter rates and vessel values*, failure of a seller to deliver one or more vessels, failure of a buyer to accept delivery of a vessel, inability to procure acquisition financing, default by one or more charterers of our ships, changes in demand for drybulk commodities, changes in demand that may affect attitudes of time charterers, scheduled and unscheduled drydocking, changes in DryShips Inc.'s voyage and operating expenses, including bunker prices, drydocking and insurance costs, changes in governmental rules and regulations, potential liability from pending or future litigation, domestic and international political conditions, potential disruption of shipping routes due to accidents, international hostilities and political events or acts by terrorists. (emphasis added).

The Primelead spin-off statement itself explicitly noted that the spin-off

would be dependant upon market conditions. The October 17, 2008, prospectus

listed specific risk factors related to world markets that could affect the company

operations:

There are signs that the United States and other parts of the world are exhibiting deteriorating economic trends and may be entering into a recession. . . .

. . .

We face risks attendant to changes in economic environments, changes in interest rates, and instability in certain securities markets, among other factors. Major market disruptions and the current adverse changes in market conditions and regulatory climate in the United States and worldwide may adversely affect our business or impair our ability to borrow amounts under our credit facilities or any future financial arrangements. The current market conditions may last longer than we anticipate. However, these recent and developing economic and governmental factors *may have a material adverse effect on our results of operations*, financial condition or cash flows and could cause the price of our common stock to decline significantly. (emphasis added).

The May 7, 2009, supplement to the October 2008 prospectus provided

further cautionary language related to the Primelead spin-off under the heading

"Recent Developments":

"Due to the disruptions in the credit markets worldwide and weakness in the energy sector, we do not expect  to complete the spin off until the second half of 2009. . . . [H]owever, *there can be no assurance that we will complete the spin off during the second half of 2009. If the spin off is delayed or does not occur*, we will own and operate a fleet of six ultra deep water semi-submersible drilling rigs, including four newbuildings. (emphasis added).

The Supplement then delineated specific risks including the following:

The abrupt and dramatic downturn in the drybulk market, from which we have derived the large majority of our revenues, has severely affected the drybulk shipping industry and harmed our business. The Baltic Dry Index fell 94% from a peak of 11,793 in May 2008 to a low of 663 in December 2008. It has since risen to 2,065 as of May 6, 2009. However, there is no indication that the drybulk charter market will

experience any significant recovery over the next several months and the market could decline from its current level.

. . .

No financing has been arranged for the acquisition of the two newbuilding drillships under construction, Hulls 1837 and 1838, which we intend to acquire through our subsidiary, Primelead Shareholders, *irrespective of whether the spin off of Primelead Shareholders occurs*. As discussed above, *whether or not the spin off of Primelead Shareholders occurs*, we intend to acquire DrillShips Holdings, . . .

. . .

Plaintiffs argue that the bespeaks caution doctrine does not apply because the cautionary statements do not directly address changes in distribution ratio. While creative, this argument must fail. The cautionary statements warned that the spin-off might not occur at all; that is, that a distribution ration of 0:1, rather than 1:1, might occur. Potential investors were placed on notice by DryShips that not only was the future spin-off of Primelead dependant upon market conditions, but that the assumptions underlying the spin-off, including charter rates and market conditions, had already begun deteriorating. Supplementary materials provided by the company prior to the May 27, 2009, offering explicitly stated that those conditions had not improved and that the spin-off would be delayed—if it occurred at all.  By the time of the offering, the total mix of information indicated that the Primelead spin-off was speculative, at best. No reasonable investor could have been misled into believing that DryShips's spin-off of Primelead was anything but a risky prospect. "Because a reasonable investor would not have

ignored such warnings, these alleged misrepresentations are immaterial as a matter of law" and must be dismissed under the bespeaks caution doctrine. Parnes, 122 F.3d at 549.

Alternative to the bespeaks caution doctrine, the allegedly misleading statement was accompanied by sufficient cautionary language to fall within the statutory safe harbor. DryShips explicitly stated that the spin-off would depend upon prevailing market conditions and charter rates and repeatedly warned that both were deteriorating. DryShips warned investors about specific, detailed risks, and those risks ultimately occurred. Because the identified risks were detailed and specific to DryShips's business, defendants' forward-looking statements were accompanied by meaningful cautionary language. These statements are protected by the safe harbor provision of the Securities Act. Plaintiffs fail to present a claim under Sections 11 or 12 of the Securities Act as to the May 27, 2009, offering. As there is no underlying securities claim to which a controlling person claim might apply, plaintiffs' claim under Section 15 of the Act must likewise fail.  See Parnes, 122 F.3d at 550 n.12.

Plaintiffs' next set of Securities Act claims stem from a September 7, 2010, prospectus supplement governing a DryShips stock offering underwritten by Deutsche Bank. Plaintiffs' complaint asserts the same general allegations for these

37

claims as to those related to the October 17, 2008, prospectus: that the September 7, 2010, prospectus supplement incorporated the October 17, 2008, one-to-one ratio Primelead spin-off statement and was false because the spin-off yielded a ratio less than one-to-one.

However, the September 7, 2010, prospectus supplement modified DryShips's September 3, 2010, prospectus, not the October 2008 prospectus. Neither the September 3, 2010, prospectus nor the September 7, 2010, prospectus supplement reference the October 17, 2008, prospectus. Resultantly, neither contains the one-to-one ratio spin-off language. Plaintiffs' complaint fails to state how any statement in the September 7, 2010, prospectus supplement was false. Plaintiffs, therefore, fail to state a securities fraud claim as to this prospectus supplement.  See In re NationsMart Corp. Sec. Litig., 130 F.3d 309, 315 (8th Cir. 1997). Plaintiffs' claims for controlling person liability under Section 15 also fail. See Parnes, 122 F.3d at 550 n.12.[11]

In their memorandum in opposition to the DryShips defendants' motion to dismiss, plaintiffs ask the Court to grant leave to amend in the event that the complaint is deemed deficient. But, "in order to preserve the

---

[11]Although defendants also challenge plaintiffs' standing to bring Securities Act Claims, I need not reach this issue because plaintiffs fail to state a claim.

right to amend the complaint, a party must submit the proposed amendment along with its motion." <u>Clayton v. White Hall Sch. Dist.</u>, 778 F.2d 457, 460 (8th Cir.1985).  Plaintiffs fail to comply with necessary procedure. As a result, plaintiffs' request to amend is denied.

### *Conclusion*

Because plaintiffs do not sufficiently allege an actionable misrepresentation or omission or scienter, the second amended complaint must be dismissed. Accordingly,

**IT IS HEREBY ORDERED** that defendants' motions to dismiss [Doc. # 45 & 49] are granted, and plaintiffs' amended complaint is dismissed.

A separate Judgment in accordance with this Memorandum and Order is entered the same date.


_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE


Dated this 6th day of November, 2012.